[No. 36996. En Banc. April 23, 1964.]

GLENN A. MARTIN et al., *Respondents and Cross-appellants,* v. THE PORT OF SEATTLE, *Appellant.*
VERN AARHUS et al., *Respondents and Cross-appellants,* v. THE PORT OF SEATTLE, *Appellant.**

*Reported in 391 P. (2d) 540.

*Bogle, Bogle & Gates, Robert W. Graham, Thomas L. Morrow,* and *Richard L. Young,* for appellant.

*Short, Cressman & Cable, Paul R. Cressman, William L. Hintze, Riddell, Williams, Voorhees, Ivie & Bullitt, Richard H. Riddell,* and *Stephen E. DeForest,* for respondents and cross-appellants.

*Cleary, Gottlieb, Steen & Hamilton, Lyman M. Tondel, Jr.,* and *John E. Stephen,* of counsel, amici curiae.

FINLEY, J.—This is an "inverse condemnation"[1] action brought by 196 property owners against the Port of Seattle, a municipal corporation, as owner of the Seattle-Tacoma International Airport. The respondent property owners seek

---

[1] Inverse condemnation is the popular description of an action brought against a governmental entity having the power of eminent domain to recover the value of property which has been appropriated in fact, but with no formal exercise of the power. *Thornburg v. Port of Portland* (1962), 233 Ore. 178, 376 P. (2d) 100.

damages for an alleged taking or damaging of their property for public use caused by nearby low altitude flights of jet aircraft landing and taking off from the airport. The sole question on this appeal is whether the property owners have stated a claim for relief due to such jet aircraft flights. The question of actual individual monetary damage is by stipulation reserved for later separate trial.

The property in question is located directly south of the primary north-south runway of the Seattle-Tacoma Airport, in a rectangular area roughly one mile long and one-half mile wide, bounded by South 200th Street on the north, South 216th Street on the south, 16th Avenue South on the west, and 24th Avenue South on the east. The litigated area of approximately one-half square mile has been somewhat arbitrarily defined for the purposes of suit in such a manner that it is bisected by an imaginary flight line extended south along the direction of the runway. The northernmost edge of the litigated area is approximately 9/10ths of a mile from the end of the runway, and jet aircraft in the process of landing pass over this imaginary centerline of the area at altitudes of less than 500 feet.

The plaintiffs contend, in general, that the use of appellant's airport by jet aircraft[2] has unreasonably interfered with the use and enjoyment of their properties and caused substantial depreciation in the value of those properties. While the parties have been segregated for the purpose of suit in such a manner as stresses the presence or absence of an actual physical invasion of airspace,[3] the contentions of the plaintiffs make it clear that the gravaman of the complaint is the noise and vibration created by the aircraft

---

[2]The record shows that the first regularly scheduled commercial jet flight was made on October 2, 1959, and the number of jet landings per month thereafter increased from 12 in January 1960 to 1,302 in August 1962.

[3]The property owners are, for the purposes of suit, divided into three groups. The "A" group is comprised of owners subjected to direct overflights, the "B" group of owners for which it is disputed whether or not there are any overflights, and the "C" group of owners which suffer no overflights.

rather than physical invasion,[4] making it apparent that any differentiation on this basis would be of little practical significance.

The plaintiffs make extensive claims of interference and damage flowing from the flights in close proximity to their land, some summary of which should be made here to indicate the extent of the growing societal problem of which the present action may be only a harbinger. The plaintiffs claim that, when jet aircraft pass over or in close proximity, conversation is halted, radio and television reception is disrupted, and the sound obliterated. The jets cause vibrations in the houses and of their contents, rendering it necessary to hammer the nails back into the siding of some of the homes at about 6-month intervals, and to tighten light fixtures periodically. Sleep is disrupted, outdoor entertainment almost impossible, and the noise painful to many. The noise also causes fear, particularly in small children. It is asserted that the respondents cannot sell their homes, and that the property values are substantially reduced.

The trial court held that the plaintiffs had stated a claim for relief. The theory which forms the basis of this holding may be set out as follows. The property owners were conceptually divided into two groups, one group comprising those having land which was subjected to direct overflights by the jet aircraft, the second, those as to which no overflights were shown. Respecting the first group, the trial court held that the overflights amounted to a *taking* of an air easement without just compensation in violation of Art. 1, § 16, Amendment 9, of the Washington Constitution and Amendment 14 of the United States Constitution. As to the second group, the trial court held that the regular low flights near by amounted to a *damaging* of the properties without payment of just compensation in violation of Art. 1, § 16, Amendment 9, of the Washington Constitution. According to stipulation, judgment was entered only as to

---

[4]This distinction accepts the perhaps unwarranted assumption commonly found in the federal cases that sound and vibration waves cannot be considered a "physical invasion," thereby also avoiding the sterile arguments sometimes directed along those definitional lines.

potential liability, leaving the matter of damages to proof on an individual plot-by-plot basis in subsequent proceedings.

We are substantially in agreement with the trial court. However, this court will not in this case stress any of the proposed distinctions between the "taking" and the "damaging" of a property right respecting the use and enjoyment of the land. As the Washington Constitution affords or provides a basis for compensation in either instance, subtle efforts at legal refinement to characterize and describe a particular interference can be expected to be more difficult and treacherous than convincing or utilitarian.

■ There seems little doubt that the noise of jet aircraft in the process of landing or taking off can amount to a taking or damaging of property for which Amendment 9 of the Washington Constitution requires that compensation be made. The term "property," as used in that provision, was defined in *Ackerman v. Port of Seattle* (1960), 55 Wn. ·(2d) 400, 348 P. (2d) 664, 77 A.L.R. (2d) 1344, to include the unrestricted right to use, enjoy, and dispose of the land. It was there held that the frequent flights over the land of the plaintiffs amounted to a taking for which compensation in terms of the decline in market value of the land was required. The defendant in *Ackerman* was the same entity here involved.

■ An identical result follows in the instant case from the clear direction of the Constitution that just compensation be made for the taking or damaging of "property," as defined in *Ackerman*. The only remaining obstacle to the plaintiffs' recovery under this approach is the problem of proving measurable detriment to the market value of their land under the traditional rules of proof. Whether the "cause of action" for the recovery of compensation is viewed as resulting from the due process provisions of the Constitution, or as resulting from an adaptation of older ideas of eminent domain and the condemnation of private property for public use, is of little significance. When the noise and intense vibration produced by low-flying jet aircraft deprives the owner of land of an essential element in his re-

lationship to that land, the result should be the same whether the airport operator himself brings the action to "condemn" the right to so interfere with the land, or the landowner is forced to be the moving party. It should be noted that the federal government has developed the practice of affirmatively moving to condemn so-called "air easements" in connection with the operation of their air bases. See *United States v. 15,909 Acres,* 176 F. Supp. 447 (S.D. Cal. 1958). It also appears that the right of a property owner to proceed against the federal government on a theory that the noise of jet aircraft have "taken" his right to use and enjoyment of land is well established, recognized, and accepted. *Aaron v. United States,* 311 F. (2d) 798 (Ct. Cl. 1963); *Batten v. United States,* 306 F. (2d) 580 (C.A. 10th 1962); *Jensen v. United States,* 305 F. (2d) 444 (Ct. Cl. 1962); *Davis v. United States,* 295 F. (2d) 931 (Ct. Cl. 1961); *Bacon v. United States,* 295 F. (2d) 936 (Ct. Cl. 1961). Some state courts recognize that the noise of jet aircraft, and its interference with the use of land not included in a condemnation begun by the state, are additional elements of compensable damage includable in the payments required for the land or airspace actually physically taken in the action. *Bowling Green-Warren Cy. Airport Bd. v. Long,* 364 S.W. (2d) 167 (Ky. 1962); *Johnson v. Airport Authority of the City of Omaha* (1962), 173 Neb. 801, 115 N.W. (2d) 426.

The appellants resist the conclusions that would seem to flow from the above reasoning with a series of arguments which may be roughly grouped within three broad contentions: (1) That the Congress of the United States has placed all navigable airspace within the public domain, with the result that no use of such airspace by the public can result in liability; (2) that there can be no "taking or damaging" in the constitutional sense in the absence of a direct overflight of the plaintiff's land; and (3) that recovery based upon an alleged interference with the exercise or enjoyment of property rights must be limited to those instances where a *substantial* interference is shown, as

opposed to a mere "incidental" damaging. These contentions will be considered in the above sequence.

 The Congress has placed certain airspace in the public domain. Consequently, aircraft are permitted to use such airspace subject only to federal regulation of their routes and operating procedures. In the Federal Aviation Act of 1958, the "navigable airspace" of the United States was expressly extended to include. any and all airspace "needed to insure safety in take-off and landing of aircraft."[5] It is the position of the appellant that such legislation creates such an unrestricted right of use as to prevent any action for trespass or for nuisance, or based on any other theory that would place a burden upon interstate commerce.[6] This approach, however, overlooks the fact that recovery for the landowner is supported upon reasoning akin to eminent domain, and the taking of private property or rights for the public benefit, and not upon any consideration of whether that taking should be classed as "wrongful" or tortious under any common-law theory. It does not follow from the inability of the landowner to enjoin the use of the navigable airspace, semantic difficulties aside, that he should be unable also to recover for a decline in the market value of his land which was brought about or inflicted for the public benefit.

In *Griggs v. County of Allegheny* (1962), 369 U.S. 84, 7 L. Ed. (2d) 585, 82 S. Ct. 531, the Supreme Court of the United States took specific notice of the 1958 Act:

" . . . Following the decision in the *Causby* [328 U.S. 256, 90 L. Ed. 1206, 66 S. Ct. 1062] case, Congress redefined 'navigable airspace' to mean 'airspace above the minimum altitudes of flight prescribed by regulations issued under this chapter, and shall include airspace needed to insure safety in take-off and landing of aircraft.' . . . By the present regulations the 'minimum safe altitudes' within the meaning of the statute are defined; so far as relevant

---

[5] 72 Stat. 737, 49 U.S.C.A. § 1301 (24) (Supp. 1961).

[6] It might also be noted here that the present lawsuit seeks just compensation not from the airlines or the federal government, but from the Port of Seattle, an entity subject to state law as well as federal regulation.

here, as heights of 500 feet or 1,000 feet, '[e]xcept where necessary for take-off or landing.' But as we said in the *Causby* case, the use of land presupposes the use of some of the airspace above it. . . ."

We are here in agreement with the Supreme Court, and find no merit in the argument that the privilege to use the navigable airspace automatically means freedom from liability for damage or demonstratable pecuniary loss to property owners below. Flights are not immune from private litigation, whether in the process of take-off or landing; *Matson v. United States* (1959), 171 F. Supp. 283, or above 500 feet, *Thornburg v. Port of Portland* (1962), 233 Ore. 178, 376 P. (2d) 100.

■ The appellants next contend that the terms "taking and damaging" of the Washington Constitution provide recovery in only those instances where a property right is taken by the passage of the aircraft directly over the land of the plaintiff. This requirement, that a landowner show a direct overflight as a condition precedent to recovery of the damages to his land, is presently stressed by some federal courts in construing the "taking" as contemplated by the Fourteenth Amendment to the Federal Constitution. *Batten v. United States*, 306 F. (2d) 580 (C.A. 10th 1962). We are unable to accept the premise that recovery for interference with the use of land should depend upon anything as irrelevant as whether the wing tip of the aircraft passes through some fraction of an inch of the airspace directly above the plaintiff's land. The plaintiffs are not seeking recovery for a technical trespass, but for a combination of circumstances engendered by the near-by flights which interfere with the use and enjoyment of their land.

Both *United States v. Causby* (1946), 328 U.S. 256, and *Griggs v. Allegheny Cy.* (1962), 369 U.S. 84, allowed recovery for repeated low-level flights over private land. While a direct overflight or invasion of airspace is in fact involved in each case, it is not clear that the reasoning and approach of those cases is so limited. Realistically, it must be conceded that a major part of the damage in either case was engendered by noise and vibration, whether or not

accompanied by a physical displacement of air above the property. Thus, in *Causby*, the noise which frightened the chickens to a point where that type of ranching became impossible would presumably be equally inimical to the use of the land whether it came from directly overhead or obliquely from flights through the adjoining airspace of a neighbor. Again in *Griggs*, the loss of sleep due to noise and vibration was stressed as an important factor in allowing recovery, in addition to the fears engendered by the physical passage of the aircraft above or in close proximity to the home. The reliance placed upon the high noise level by the Supreme Court in both decisions, without detectable preoccupation with its angle of incidence, strongly indicates that the holdings are not limited to those instances where the aircraft passes directly over the land.

A careful reading of the above considered cases leads this court to the conclusion that the limitations inherent in the common-law concepts of trespass and ouster of possession, while highly useful in some contexts, can rapidly become outmoded in dealing with current and evolving spaceage sonic and supersonic phenomena. It is more likely that the view of Chief Judge Murrah, dissenting in *Batten*, represents the position of the United States Supreme Court. Finding it unnecessary to adhere to a strict trespass rule, he suggests compensation whenever the interference with the use of land is of sufficient directness, peculiarity, and magnitude "that fairness and justice, as between the State and the citizen, requires the burden imposed to be borne by the public and not by the individual alone." We must agree that the problem of balancing the interests involved, public and private, seems much the same whether a physical trespass is or is not involved.

In addition to the above, further reason exists in Washington for refusing to adopt the overly strict interpretation of "taking" pressed by the appellant. The language of the ninth amendment of the Washington Constitution provides for just compensation of not only a "taking," but also a "damaging." The specific purpose of the addition of language beyond that of the United States Constitution is to

avoid the distinctions attached to the word "taking" appropriate to a bygone era. It is unnecessary to become embroiled in the technical differences between a taking and a damaging in order to accord the broader conceptual scope intended by the additional language. See *Ackerman v. Port of Seattle, supra*; 47 Minn. L. Rev. 889 (1963).

We hold that no overflight or direct physical invasion of the airspace over the land is necessary in order to maintain an action under the "taking or damaging" provisions of the state constitution.

■ Lastly, the appellant directs his arguments to the showing of damage and interference with use and enjoyment which was made at the trial by the plaintiff-respondent landowners. It is argued that the interference with private property rights must be shown to be a "substantial" interference before it can amount to a "taking" or a "taking or damaging" within the purview of the constitutional language, and that any lesser showing must be considered a mere noncompensable "incidental" damaging. The terms "substantial injury" and "substantial interference" appear commonly in the decided cases, sometimes as if it were the sine qua non of recovery. The terms are not pertinent, however, in the "inverse condemnation" context, where the action is strongly analogous to the eminent domain proceeding. It differs from eminent domain only in that the landowner institutes the action, rather than the entity possessing the condemnation power. Also, the plaintiff landowner in the inverse condemnation setting is usually claiming a partial taking or damaging rather than a total loss of the land itself.

When this action is analyzed in this manner, the term "substantial" is of dubious relevancy or utility. It connotes a balancing of the interests of the public in general against those of the individual. Inherent is the idea that the individual must bear a certain amount of inconvenience and loss of peace and quiet as the cost of living in a modern, progressing society. In eminent domain, and in inverse condemnation, such a balancing does not have to be accomplished as a distinct process, simply because the individual

seeks no recovery for his individual suffering, damage, loss of quiet, or other disturbance. These elements of damage are cognizable in a tort action, and such a balancing would thus be necessary. But in inverse condemnation the measure of recovery is injury to market value, and that alone.[7]

Therefore, the balance of interest inherently struck in this type of action comes about in the following manner. If the individual is unusually sensitive, and sustains a greater injury than might be suffered by the general public from such interference, the public interest in maintaining the flights leaves him to one remedy—to sell his property and move. This is no different than it would be had his land been condemned for forced sale to the state. But whichever way the state exacts such a "sale," it must pay the individual the amount he suffers in the diminishment of the value of his land, as reflected by the decrease in the amount he can receive in a sale to a willing buyer. Such lowering of market value reflects not the personal injury to the individual, but the lesser desirability of the land to the general public; i.e., to a ready, able, and willing buyer. When the land of an individual is diminished in value for the public benefit, then justice, and the constitution, require that the public pay.

In the above manner, the interests which would otherwise be protected by the requirement of a "substantial" injury are vindicated in two distinct ways. First, where there is only an injury of the extent such that it should be called or labeled "incidental," no measurable or provable decline in market value could be expected traceable to the flights. Recovery would not be forthcoming, but not because of some arbitrary rule set for convenience in administration of justice, but because of an inability to prove damages according to the common and well understood rules of suit. Second, and even more significant to the balancing problem, the smaller the provable decline in market value, the slighter the burden cast upon the public in paying for it. Surely the protection of the public interest

---

[7]*Ackerman v. Port of Seattle* (1960), 55 Wn. (2d) 400, 348 P. (2d) 664.

320

does not entail the refusal of *small* claims on the ground that the burden to the public is not great enough to pay for!

Upon the reasoning hereinbefore set out, we therefore hold that the plaintiffs, in pleading the interference with the use and enjoyment of their land, with a subsequent decline in market value, have stated a claim upon which relief can be granted. The judgment should be affirmed in conformity with the conclusions reached herein. It is so ordered.

ALL CONCUR.

August 14, 1964. Petition for rehearing denied.

*Reported in 391 P. (2d) 547.