[No. 29357-5-I.   Division One.   July 6, 1993.]

NORTHLAKE MARINE WORKS, INC., *Appellant,* v. THE CITY OF SEATTLE, ET AL, *Respondents.*

---

492

*William J. Bender, Christine Lamson,* and *Skellenger, Bender, Mathias & Bender,* for appellant.

*Mark H. Sidran, City Attorney,* and *Judith B. Barbour, Assistant; Colleen A. Christensen, William F. Cronin,* and

*Bogle & Gates; Janet E. Garrow, John W. Hempelmann,* and *Cairncross & Hempelmann, P.S.,* for respondents.

GROSSE, J. — The appellant, Northlake Marine Works, Inc. (Northlake), brought this action to quiet title in a section of an abandoned railroad right of way north of Lake Union. Northlake claims it owns a reversionary interest in the right of way through its purchase of several quitclaim deeds to five adjacent lots.

Northlake also challenges an agreement entered into by the respondents, the City of Seattle (City), Fremont Dock Company (Fremont Dock), and Inland Properties, Inc. (Inland Properties), contending that the City's participation in the agreement violates the constitutional prohibition against gifts of public property and lending of credit. Northlake also asserts the agreement constitutes inverse condemnation of its property by depriving it of parking and allowing development in violation of land use regulations. We affirm the trial court in part with respect to Northlake's reversionary interest in the railroad right of way adjacent to four of the lots. We reverse and remand for the determination of Northlake's ownership interest in the remaining lot and the adjoining section of the right of way. We affirm the trial court's dismissal of Northlake's constitutional and inverse condemnation claims pertaining to the City's agreement.

This suit arose out of a property dispute involving a 100-foot-wide railroad right of way in the Fremont area north of Lake Union. The right of way was originally deeded to Seattle Lake Shore & Eastern Railway in 1887 by Thomas and Carrie Burke.[1] The deed provided:

> In consideration of the benefits and advantages to accrue to us from the location, construction and operation of the Seattle, Lake Shore and Eastern Railway, in the County of King, in Washington Territory, we do hereby remise, release and forever quitclaim unto said Seattle, Lake Shore and Eastern Railway Company a right of way one hundred (100) feet in width through the lands in said County, described as follows, to-wit: . . .
> . . . .

---

[1]The railroad right of way is indicated on appendix A.

> To have and to hold the said premises, with the appurtenances, unto the said party of the second part, and to its successors and assigns forever for railway purposes; but if it should cease to be used for a railway the said premises shall revert to said grantors, their heirs, executors, administrators or assigns.

Adjacent to the right of way are lots 10, 11, 17, 18, and 19 of block 86, a section of Denny & Hoyt's Supplemental Plat.[2] Northlake holds quitclaim deeds to those lots adjacent to the right of way and asserts that its interest in those lots gives it a reversionary interest in the railroad right of way. This interest, however, is subject to a competing claim by the City.

In 1916, the City passed an ordinance authorizing the condemnation of these lots for the construction and use of Northlake Way. A judgment on verdicts was entered in 1916 condemning lots 10, 11, 17, and 18 of block 86 and vesting title to the property in fee simple to the City.

Lot 19, however, was not condemned in this condemnation proceeding. The history of lot 19 is obscured by discrepancies in the records of the period. The 1888 Denny & Hoyt's Supplemental Plat containing block 86 shows lot 19 as an upland lot that is part of block 86. See app. B. In 1889, the Legislature adopted an article of the state constitution granting state ownership of the beds and shores of navigable waters.[3] A 1907 map of the Lake Union area made by the state land commissioners platted the Lake Union Shore Lands. This 1907 plat does not show lot 19 as part of block 86, but as part of block 102 of the Lake Union plat. Lot 19 appears to be largely submerged. See app. C. A definite discrepancy exists in the shoreline of the 1888 plat and the 1907 plat.

The parties accordingly dispute the original ownership of lot 19. Northlake argues that because the 1888 plat shows

---

[2]The Burkes quitclaimed their interest in the north Lake Union area in 1888 to John Hoyt. Hoyt conveyed the parcel to Blewett by warranty deed, and the plat was filed as Denny & Hoyt's Addition to the City of Seattle. Block 86, containing the disputed land in this case, was initially reserved, then platted later that year as part of the Denny & Hoyt's Supplemental Plat to the City of Seattle.

[3]Const. art. 17, § 1.

lot 19 as upland and not shoreland, it was not subject to the state ownership of shorelands mandated by the 1889 constitutional articles. In turn, respondents assert that the 1907 plat indicates the area is reserved as a street. In spite of this conflicting evidence, the record indicates that Northlake's predecessor in interest, San Juan Investment Company, held the title to lot 19 in fee simple at the time of the 1916 condemnation proceedings. Although lot 19 was included in the petition for condemnation, it was not included in the judgment. Northlake Way was in fact constructed on the site of lot 19 during the late 1950's to early 1960's. On the basis of the record before us, the precise nature of Northlake's interest in lot 19 is unclear.[4]

In 1908, the State conveyed to Northern Pacific Railway Company (Northern Pacific) a small slice of the land immediately adjacent to lot 19. The deed described the land as follows:

Block 102, except that portion lying east of the west line of Edgewater Addition to Seattle, as shown as Plate [sic] 11 of the official maps of Lake Union Shore Lands, produced across said Block 102, and south of the Northern Pacific Railway Company's right of way as shown on the official maps of Lake Union Shore Lands . . .[.]

The 1907 plat shows this slice of land as being part of shorelands.[5] The 1907 plat conflicts with the 1888 Denny & Hoyt's Supplemental Plat, which shows the area north of lot 19 as upland, not shoreland. The record does not conclusively explain or reconcile the discrepancies in the Lake Union shoreline. Consequently, it is unclear whether the deeded right of way property was shoreland subject to the State's ownership under the state constitution or uplands in

---

[4]At trial, for the purposes of determining Northlake's interest in the railroad right of way, the trial court assumed Northlake's ownership of lot 19.

[5]See app. C. This conveyance was made pursuant to a preference claim when the State sold its shorelands around Lake Union. Northern Pacific filed its preference claim for the area north of lot 19 contained in block 102, while San Juan Investment Company filed for lots 11 and 12 of block 99 of the Lake Union plat.

which the abutting property owners would hold a reversionary interest.

In 1978, Burlington Northern Railroad Company (Burlington Northern), successor in interest to Northern Pacific, quitclaimed its interest in the south half of the right of way to Fremont Dock. In 1982, Fremont Dock leased a portion of the right of way to Northlake for parking under the terms of a month-to-month lease. In 1988, Burlington Northern quitclaimed its interest in the north half of the railway to Dennis Washington and subsequently abandoned the right of way. Northlake purchased quitclaim deeds to lots 9, 10, 11, 17, 18, and 19. Washington quitclaimed his interest in the north half of the right of way to Inland Properties.

The City then executed an agreement with Inland Properties, Fremont Dock, and Quadrant Corporation. In that agreement, the City agreed to transfer its interest in the southern half of the railroad right of way to Inland Properties and Fremont Dock. Inland Properties, Fremont Dock, and Quadrant Corporation granted the City a perpetual easement for the extension of the Burke-Gilman trail through a portion of the railroad right of way and along the ship canal.

The City's easement is conditional: (1) the City must complete a planning process and determine that the Burke-Gilman trail should be extended over portions of the right of way; (2) the City must dismiss the declaratory proceeding with the Interstate Commerce Commission contesting Burlington Northern's sale of the north half of the right of way to Inland Properties; (3) the City must assign its entire interest in the right of way to Inland Properties and Fremont Dock.

After the City, Inland Properties, Fremont Dock, and Quadrant Corporation executed the agreement, Northlake continued in its month-to-month lease for accessory parking on the right of way with Fremont Dock as lessor. The accessory parking was necessary for Northlake because it had expanded its business operations and was required under Seattle Municipal Code 23.54.025 to provide additional parking. The park-

ing arrangement continued until some time after Northlake filed this action, when Fremont Dock terminated the lease.

Northlake filed suit to quiet title to the southern half of the railroad right of way adjacent to lots 10, 11, 17, 18, and 19. The suit was based on three theories: Claim 1 was an action to quiet title in Northlake based upon its interest obtained through the quitclaim deeds to the adjacent lots. Claim 2 sought an injunction to prevent the transfer of the railroad right of way by the City based upon the theory that the transfer was an unconstitutional lending of credit or gift. Claim 3 was based on inverse condemnation, wherein Northlake claimed that it had been injured by the City's agreement, which allegedly deprived Northlake of parking space and allowed development of property surrounding Northlake in violation of land use regulations.

The defendants/respondents brought a motion for summary judgment to dismiss the claims of Northlake. The trial court held that as a matter of law the City acquired fee simple absolute to lots 10, 11, 17, and 18 in the 1916 condemnation proceeding, including the reversionary interest in the adjacent right of way. The court also found that although lot 19 had not been condemned, the City had likely only acquired a prescriptive easement in that lot. Because the State had conveyed title to the adjacent section of the right of way to the railroad in 1908, the court reasoned that Northern Pacific thereby obtained the reversionary interest in the right of way adjacent to lot 19. The court alternatively held that the railroad had received title to lot 19 by adverse possession under the connected title statute, RCW 7.28.050.

The trial court also dismissed claim 2, reasoning that the agreement was for a public purpose and was supported by consideration; therefore, the agreement was not an unconstitutional loan of credit or gift. The court further found that Northlake's inverse condemnation claim, claim 3, was groundless because the only interference to Northlake's property was deprivation of parking, and because there was no inherent duty of the City to provide parking, no compensable interest was denied. The trial court subsequently entered an order dis-

missing all three claims in their entirety. Northlake timely appealed from this judgment. Northlake also requested this court to grant a preliminary injunction allowing it to remain in possession of the right of way until its claims were resolved. The motion was denied.

■ The review of the disposition of a summary judgment motion is governed by well-established rules that we need not repeat. *Zachman v. Whirlpool Acceptance Corp.*, 120 Wn.2d 304, 308, 841 P.2d 27 (1992). In a proceeding to quiet title, "a party seeking to quiet title to property must succeed on the strength of his or her own title, not on the weakness of the other party's title." (Footnote omitted.) *Kesinger v. Logan*, 113 Wn.2d 320, 328, 779 P.2d 263 (1989) (citing *Desimone v. Spence*, 51 Wn.2d 412, 415, 318 P.2d 959 (1957)).

In its quiet title action, Northlake argues that the City's exercise of its power of eminent domain in the 1916 condemnation proceedings did not extend to condemn the reversionary rights in the lots abutting the right of way.[6] Northlake reasons that because the reversionary rights remained intact in the original lot owners, their interest subsequently passed to Northlake by operation of several quitclaim deeds.

In order to resolve the issue of whether Northlake has a reversionary interest in the railroad right of way, it is first necessary to determine the exact nature of the railroad's right of way interest and the interest of the adjacent lots. In *Pacific Iron Works v. Bryant Lumber & Shingle Mill Co.*, 60 Wash. 502, 506, 111 P. 578 (1910), the Supreme Court held that the Burke right of way deed in this case conveyed only an easement, and not a fee. Accordingly, the Burkes retained a fee interest in the railroad right of way. The record indicates that the Burkes later conveyed this fee interest when

---

[6]The Washington State Constitution eminent domain clause provides in part: "No private property shall be taken or damaged for public or private use without just compensation having been first made, or paid into court for the owner, and no right-of-way shall be appropriated to the use of any corporation other than municipal until full compensation therefor be first made in money, or ascertained and paid into court for the owner, irrespective of any benefit from any improvement proposed by such corporation, which compensation shall be ascertained by a jury, unless a jury be waived . . .". Const. art. 1, § 16 (amend. 9).

the larger parcel of land was conveyed to John Hoyt by quitclaim deed in 1888. The underlying fee interest then passed to Hoyt's successor in interest, Blewett, who platted the adjoining property.

■ The adjacent lots retained an interest in the railroad right of way under the "highway presumption" followed in this state. Under that presumption, "the conveyance of land which is bounded by a railroad right of way will give the grantee title to the center line of the right of way if the grantor owns so far, unless the grantor has expressly reserved the fee to the right of way, or the grantor's intention to not convey the fee is clear." (Footnote omitted.) *Roeder Co. v. Burlington Northern, Inc.*, 105 Wn.2d 567, 576, 716 P.2d 855 (1986). This presumption is rebuttable, and if metes and bounds provisions in the deed describe property that extends up to but does not include the right of way, the presumption is rebutted. However, in this case, the lots were not described by metes and bounds, but merely by lot number. Therefore the presumption applies and the abutting lots retained a reversionary interest to the center line of the right of way.

The next inquiry is whether the City then obtained that reversionary interest in the right of way in the 1916 condemnation proceedings. Northlake argues that the reversionary interest in the railroad right of way is a protected property interest, relying on *Lawson v. State*, 107 Wn.2d 444, 457, 730 P.2d 1308 (1986). The *Lawson* court held that a reversionary interest in a railroad right of way was an alienable and devisable interest protected under the takings clause of the state constitution. *Lawson*, 107 Wn.2d at 457. From this proposition, Northlake concludes that the reversionary interest in the right of way is separate from the fee interest in the abutting property. Therefore, when the City condemned the adjacent lots in 1916 it received only that interest pertaining to land strictly within the parameters of the lots. However, this conclusion is unsupported.

■ This state recognizes that when a governmental entity exercises its power of eminent domain in a condemnation proceeding, title passes as between a conventional grantor

and grantee in a voluntary conveyance. *Bethany Presbyterian Church v. Seattle*, 154 Wash. 529, 533, 282 P. 922 (1929). In the case at hand, the parties do not dispute that the condemnation proceeding awarded the City title in fee simple to lots 10, 11, 17, and 18, consistent with authorization under the ordinance. Northlake asserts that no greater title passed than was necessary for the City's construction of Northlake Way, relying on *Neitzel v. Spokane Int'l Ry.*, 65 Wash. 100, 117 P. 864 (1911):

> Courts in construing statutes which grant the power, and authorize the taking of a certain estate or interest, enforce the rule of strict construction, permitting no greater title or interest to vest than has been expressly authorized or may be necessary to the contemplated public use.

*Neitzel*, 65 Wash. at 105. In the instant case, however, the City was expressly authorized under the ordinance to take a fee interest and did not execute a taking beyond the scope of its authority.

Nevertheless, Northlake maintains that the City's title was limited strictly to the legal description of the lots, relying on an early United States Supreme Court decision, *Harris v. Elliott*, 35 U.S. (10 Pet.) 25, 9 L. Ed. 333 (1836). The *Harris* case addressed the effect of a condemnation proceeding of land adjacent to streets. The land in that case had been specifically described by the jury for the condemnation proceeding as enclosed by fences, and the jury compensation had been specifically limited to the value of the area within the lots. Subsequently, the City abandoned use of the adjacent street, and the Supreme Court held that the reversion in the street was not an appurtenance that passed to the condemned property. This result is consistent with *Roeder Co. v. Burlington Northern, Inc.*, *supra*, where the court noted:

> When metes and bounds provisions in a deed describe property that extends up to, but does not include, a railroad right of way, the presumption that abutting property owners take title to the center of the right of way is rebutted.

*Roeder*, 105 Wn.2d at 575. Consequently, *Harris* is inapposite. The *Harris* jury condemned the land specifically within

the fenced lots, excluding the interest in the street. In contrast, the proceeding in the instant case condemned the lots without otherwise limiting the interest with a precise description of the land.

Respondents point to a similar case disposing of the issue at hand, *Housing Auth. v. Atlantic City Exposition, Inc.*, 62 N.J. 322, 301 A.2d 441 (1973). In that case, the description of land in the condemnation complaint was limited to the property adjacent to the side of a road. The court held that when a property description in a condemnation proceeding extended only to the sideline of the road, the condemnor would still take title to the center line of the road, as in a conveyance by deed. *Housing Auth.*, at 328. The court refused to recognize an exception to the general rule of highway presumption for condemnation proceedings, reasoning that the condemnor would expect to acquire the title to the center line of the road, and there would be little interest for a landowner in retaining title to a strip of land under a roadbed. *Housing Auth.*, at 328. *See also Cleaver v. Board of Educ.*, 263 Mich. 301, 304-05, 248 N.W. 629, 630 (1933) (holding that a judgment of condemnation for land within platted lot lines included the condemnee's reversionary interest in the adjoining street); *Carter v. State Dep't of Roads*, 198 Neb. 519, 254 N.W.2d 390 (1977) (holding that when the State condemned a parcel of land abutting a county street that was later abandoned, the State's interest included the fee to the center of the highway).

Northlake argues that a different result is warranted under Washington law, citing to *Pacific Cy. v. North Pac. Imp. Co.*, 170 Wash. 643, 17 P.2d 40 (1932) and *Book v. West*, 29 Wash. 70, 69 P. 630 (1902). In *Pacific Cy.*, the appellant challenged a condemnation proceeding that vested the County with fee interest to allow construction of a highway, but did not pass title to subsurface mineral rights. This case is distinguishable, however. The *Pacific Cy.* condemnation proceeding specifically exempted the mineral rights from condemnation in the jury instructions at trial. *Pacific Cy.*, 170 Wash. at 649-50.

*Book v. West, supra,* addressed a mortgage foreclosure proceeding holding that the foreclosing mortgagee took title only to the upland lots designated in the mortgage and did not receive title to improvements on adjacent tidelands. The *Book v. West, supra,* court refused to recognize separate improvements on adjacent tidelands as appurtenances that comprise part of the fee interest in upland lots. Accordingly, the court denied the mortgagee's attempts to eject the mortgagor from the improvements on the adjoining tidelands. Both cases address situations where the title to the adjoining land/subsurface rights is vested or reserved separately from the abutting land.

Northlake further contends that because the condemnation proceeding condemned portions of the right of way for road crossings, the remaining interest in the right of way was not condemned. This argument is not persuasive. The City condemned those portions of the right of way for use as easements for street crossings, thus depriving the railroad of its present possessory interest in using the property. The condemnation did not extend to the reversionary interest in the fee: "And that the remainder of said ownership is not damaged by reason of taking the right to use the above described property as a public street and highway, its use as a public street and highway to be exercised jointly with its use by the respondents for railway purposes."

In sum, Northlake fails to provide any authority in support of its proposition that the reversionary interest in the right of way survived the condemnation proceedings. Therefore, the trial court did not err by granting summary judgment on claim 1 with regard to lots 10, 11, 17, and 18.

Northlake also contends that lot 19 was not condemned; therefore, title in fee remained in its predecessor in interest, San Juan Investment Company, together with the underlying reversionary interest in the right of way. Indeed, the condemnation proceeding did not include lot 19 in the judgment on verdicts, although Northlake Way was later constructed

on the site. Under the highway presumption doctrine set forth in *Roeder Co. v. Burlington Northern, Inc., supra,* the fee owner of lot 19 would retain a reversionary interest in the abutting right of way.

█ Inland Properties argues that the State conveyed this disputed section of the right of way in a shoreline deed to Northern Pacific in 1908, pursuant to a preference proceeding for shorelands. Given the discrepancies of maps of the period, an issue of material fact exists as to whether the State ever had valid title to that section of the right of way adjacent to lot 19. The 1888 Denny & Hoyt's Supplemental Plat shows lot 19 and the abutting right of way as upland, yet the 1907 Lake Union plat indicates that section is shoreland. Despite the parties' assertions to the contrary, the issue is not readily resolvable on summary judgment. However, for the purposes of our analysis, we will assume facts most favorable to Northlake, the nonmoving party. We proceed on the premise that the state deed granting Northern Pacific's preference claim in the right of way area immediately north of lot 19 was void and that title in fee to lot 19 vested in Northlake's predecessor in interest, San Juan Investment Company.[7]

Inland Properties contends that even if the 1908 deed was void, Northlake's claim to title in that section of the right of way must fail because title was acquired by Burlington Northern through adverse possession pursuant to the connected title statute, RCW 7.28.050.[8] That statute vests title in one in

---

[7] The trial court also assumed for purposes of summary judgment that the ownership of lot 19 was in Northlake, reasoning that because the City omitted lot 19 from the condemnation proceeding, the City acquired at most a prescriptive easement when it built Northlake Way on the site.

[8] RCW 7.28.050 provides:
"That all actions brought for the recovery of any lands, tenements or hereditaments of which any person may be possessed by actual, open and notorious possession for seven successive years, having a connected title in law or equity deducible of record from this state or the United States . . . shall be brought within seven years next after possession being taken as aforesaid, but when the possessor shall acquire title after taking such possession, the limitation shall begin to run from the time of acquiring title."

actual, open and notorious possession for a period of 7 consecutive years with connected title deducible of record from the State.[9] Even a void deed is sufficient to start the running of the statute. *Aspinwall v. Allen*, 144 Wash. 198, 200, 257 P. 631 (1927) (citing *Grays Harbor Comm'l Co. v. McCulloch*, 113 Wash. 203, 193 P. 709 (1920)).

The record indicates that title is traceable from the 1908 state deed to Northern Pacific, and subsequently from Burlington Northern, Northern Pacific's successor in interest, to Fremont Dock in 1978, thereby satisfying the requirement for connected title. Further, the elements of actual, open and notorious possession appear to be satisfied: Burlington Northern and its predecessors used the right of way and paid taxes on that portion of the right of way contained within block 102 immediately north of lot 19.

However, the railroad's use is also consistent with the permissive use it was entitled to under the right of way deed. The courts of this state have also held:

> Persons may assert title to land, but the law fixes the time for the statute to begin to run against the remainderman, and unless that time has come, all pleas of the statutes of limitations must be unavailing; for the law is that a remainderman is, during the continuance of the precedent particular estate, under legal disability.

*McDowell v. Beckham*, 72 Wash. 224, 230, 130 P. 350 (1913). The *McDowell* case involved a life tenant who conveyed the title of the estate to a third party in fee. The court held that the statute would not begin to run against the remainderman until his estate had become possessory: it was not enough that he held a present interest in the land. *McDowell*, 72 Wash. at 232. This proposition was again recognized in *Martin v. Walters*, 5 Wn. App. 602, 604, 490 P.2d 138 (1971), which held, "As a general rule, possession of a life tenant or one holding under or through the life tenant, cannot be adverse to the remainderman or reversioner."

---

[9]We note that the statute does not expressly require that possession be hostile. No cases specifically resolve whether hostility must be proved under the connected title statute. In light of our disposition of the adverse possession claim on other grounds, we do not reach the issue.

However, some authorities have recognized an exception to this general rule when the holder of the reversionary interest has received notice of the adverse claim:

The possession of the life tenant cannot be adverse to the remainderman unless the life tenant has openly repudiated his status as such, and has, in a clear and convincing manner, brought home to the remainderman notice of his intention to claim title adversely to the latter.

(Footnotes omitted.) 4 G. Thompson, *Real Property* § 1895, at 683 (1979 repl.). The record indicates that Northlake's predecessor in interest, San Juan Investment Company, may have received notice of the State's claim of ownership during the preference proceedings in which Northern Pacific made claim to block 102, including the land immediately north of lot 19 in the railroad right of way. If San Juan Investment Company received such notice, the statute would have commenced running at that point and Northern Pacific would have title in fee after the 7-year statutory period expired. Northlake's reversionary interest in the right of way adjacent to lot 19 would consequently be extinguished because it would no longer be an adjacent landowner. The railroad's title in fee would abut the right of way, vesting the reversionary interest in the railroad. The question of whether notice was received presents an unresolved issue of fact.

On remand, therefore, the trial court must first resolve the factual question of ownership in lot 19 and resolve, if possible, the discrepancies in shorelines between the 1888 and 1907 plats. In addition, the trial court must determine whether the State's conveyance to Northern Pacific was valid. If the deed was void, the trial court must ascertain whether San Juan Investment Company received actual notice that the State was conveying a slice of the adjacent railroad right of way to Northern Pacific. We note that although San Juan Investment Company was itself a party to the preference proceeding and likely received a copy of the order awarding preference claims, the order may not have been sufficient to put it on notice that block 102 in actuality included a portion of the

railroad directly adjacent to its own property. The legal description of block 102, in light of the conflicting plats, may have been insufficient to accurately describe the interest claimed.

■■ In its second claim, Northlake contends that the agreement among the City, Fremont Dock, and Inland Properties is an unconstitutional gift of public property and lending of credit. Article 8, section 7 of the Washington Constitution provides:

> CREDIT NOT TO BE LOANED. No county, city, town or other municipal corporation shall hereafter give any money, or property, or loan its money, or credit to or in aid of any individual, association, company or corporation, except for the necessary support of the poor and infirm, or become directly or indirectly the owner of any stock in or bonds of any association, company or corporation.

The Washington Supreme Court has noted that the underlying rationale of this section was to prevent the appropriation of public funds for private enterprises, specifically railroads. *Tacoma v. Taxpayers of Tacoma*, 108 Wn.2d 679, 701, 743 P.2d 793 (1987). Although the parties have largely ignored the most recent cases interpreting this section, the Supreme Court has increasingly narrowed the application of this prohibition in order to more precisely conform to "the evils the framers sought to prevent." *Tacoma v. Taxpayers of Tacoma*, 108 Wn.2d at 702. In order to determine whether a gift has occurred in violation of the constitutional prohibition, it is necessary to find that property has been transferred with donative intent and without consideration. *Tacoma v. Taxpayers of Tacoma*, 108 Wn.2d at 702. If donative intent cannot be proved, the adequacy of consideration will not be closely scrutinized, but assessed for legal sufficiency: "a bargained-for act or forbearance is considered sufficient consideration." *Tacoma v. Taxpayers of Tacoma*, 108 Wn.2d at 703 (citing *Adams v. UW*, 106 Wn.2d 312, 327, 722 P.2d 74 (1986)). An incidental benefit to a private individual will not invalidate an otherwise valid transaction for a public pur-

pose. *Tacoma v. Taxpayers of Tacoma*, 108 Wn.2d at 705. The Supreme Court has recognized that any in-depth analysis of the adequacy of consideration would interfere with the government's ability to contract and establish a "burdensome precedent". *Tacoma v. Taxpayers of Tacoma*, 108 Wn.2d at 703.

In the case at hand, Northlake argues that the City received no consideration for the abandoned right of way.[10] However, the agreement provides that the City will receive a perpetual easement for the Burke-Gilman trail, portions of which run through property owned by Inland Properties and Fremont Dock. Further, the City will receive the benefit of assistance with design and construction of portions of the trail at no additional cost.

■ Northlake argues the consideration is illusory because the grant of the perpetual easement is conditional. The easement is conditional on the City performing certain conditions precedent. The City must first complete a planning process, including input from local citizens and organizations. The City is also obligated to dismiss its Interstate Commerce Commission proceeding involving the transfer of property from Burlington Northern to Inland Properties, and it must assign its interest in the right of way to Inland Properties and Fremont Dock. These conditions are wholly within the City's control, not the developers', and the perpetual easement will be granted after the City has satisfied the conditions precedent.

In sum, the City is receiving the benefit of a perpetual easement, located partially on land to which it asserts a

---

[10]Northlake compares the case at hand to *State ex rel. O'Connell v. Port of Seattle*, 65 Wn.2d 801, 399 P.2d 623 (1965). The *O'Connell* court prohibited the Port of Seattle from using public funds for "promotional hosting" of private businesses, even though the hosting may have fostered beneficial business relationships between the Port and private organizations. *O'Connell* is distinguishable, however. The expenditures of public money in *O'Connell* were unsupported by any consideration. The businessmen receiving the benefit of the Port's gratuitous hosting incurred no reciprocal legal obligation, in contrast to the agreement in this case.

claim and partially on private land. The City also will receive assistance with development and construction of portions of the trail. In addition, the agreement allows the City to avoid the costs of litigating title to the disputed property. The agreement enables the parties to privately resolve their claims without expensive litigation. Such consideration, consisting of a promise to perform and forbearance of a legal right, is sufficient to support the City's conveyance of land in the agreement.

Northlake further argues that the agreement is an unconstitutional extension of credit under Const. art. 8, § 7, relying heavily on *Lassila v. Wenatchee*, 89 Wn.2d 804, 576 P.2d 54 (1978). The *Lassila* court held that the City of Wenatchee violated the constitutional prohibition against extension of credit when it acquired a parcel of real property with the intention of reselling a portion to a private party. The City declared portions of the property as surplus to its needs and resold it to the private developer, in essence financing the developer's purchase of the land. The court further found that the asserted public benefit in the private developer's construction of a theater on the site was insufficient to validate the loan: "[T]he expected receipt of future public benefits cannot serve to validate an otherwise unconstitutional loan of credit." *Lassila*, 89 Wn.2d at 812.

The *Lassila* case is distinguishable, however. In the case at hand, the City has not acquired property with an eye to reselling it to a private developer. The City arguably had a property interest in the railroad right of way that became possessory upon abandonment. The City then entered into an agreement to convey its interest in return for the development of a public trail on that land and land owned by the private developers. The City did not finance the interests of the private developers; it entered into a contract to sell its preexisting property interest in exchange for the benefit of receiving a perpetual easement and assistance with the development and construction of the Burke-Gilman trail.

■ Moreover, the Supreme Court has in more recent cases narrowed its application of the lending of credit clause.[11] The court has found that a municipality may purchase property with the intent of reselling a portion of it to private parties if the resale of that portion is incidental to the municipality's development of the parcel, and the purchase is not made with the intent to resell to a specific private party. *United States v. North Bonneville*, 94 Wn.2d 827, 621 P.2d 127 (1980). In the case at hand, the City is not financing the developer's acquisition of public property. The City has entered into an agreement to obtain a valuable public benefit in exchange for the conveyance of its existing interest in the railroad right of way. The fact that private developers are incidentally benefiting from the acquisition of city property does not invalidate the transaction. Therefore, Northlake's contention that the agreement violates article 8, section 7 of the Washington Constitution is unfounded.

Finally, Northlake claims that the loss of its accessory parking and the development of surrounding areas constitutes inverse condemnation of its property. Article 1, section 16 of the Washington Constitution prohibits the taking of private property for public use without just compensation. An action for inverse condemnation seeks to recover compensation from the government after it has appropriated property without a formal exercise of its eminent domain authority. *Martin v. Port of Seattle*, 64 Wn.2d 309, 310 n.1,

---

[11]*See In re Marriage of Johnson*, 96 Wn.2d 255, 634 P.2d 877 (1981), where the court reasoned the framers intended that the prohibition against lending credit be directed at "loans as used in the ordinary and popular sense, between a lender and a borrower, where a question of the security of funds in such transactions would be involved . . .". *Johnson*, 96 Wn.2d at 267 (quoting *State ex rel. Graham v. Olympia*, 80 Wn.2d 672, 676-77, 497 P.2d 924 (1972)). The court adopted a "risk of loss" analysis in which the focus is on the risk of endangering public funds. *Johnson* and its progeny are discussed in Hunting, *State Lending of Credit — New Analysis of State Constitutional Prohibitions*, 61 Wash. L. Rev. 263 (1986); Spitzer, *An Analytical View of Recent "Lending of Credit" Decisions in Washington State*, 8 U. Puget Sound L. Rev. 195, 209 (1984-1985); Reich, *Lending of Credit Reinterpreted: New Opportunities for Public and Private Sector Coopera-* *tion*, 19 Gonz. L. Rev. 639 (1983-1984).

391 P.2d 540 (1964), *cert. denied*, 379 U.S. 989 (1965). A taking occurs when the government acts to interfere with the use and enjoyment of property, thereby affecting market value. *Martin*, 64 Wn.2d at 319-20. A governmental taking is distinct from mere temporary interference with a private property right that is not continuous. A taking requires a permanent or recurring invasion of property. *Northern Pac. Ry. v. Sunnyside Vly. Irrig. Dist.*, 85 Wn.2d 920, 924, 540 P.2d 1387 (1975).

■ The Washington Court of Appeals for Division Three addressed an inverse condemnation issue factually similar to the case at hand in *Billington Builders Supply, Inc. v. Yakima*, 14 Wn. App. 674, 544 P.2d 138 (1975). The plaintiff in that case owned a business adjacent to a city street, on which the City provided onstreet parking in front of the business. The City later enacted an ordinance eliminating the onstreet parking. The plaintiff argued that it was being deprived of access that would reduce its business and force remodeling of its building. The *Billington* court held that parking was not a right but a privilege, and the loss of that privilege was not a property right that could give rise to compensable damages. Northlake cites several cases involving actual physical invasion or obstructions to land, but those cases are inapposite; they address physical interference and not merely diminution in value.[12] A distinction exists between lack of access, which may constitute a taking, and lack of parking, which is a loss of a noncompensable privilege. *Billington*, 14 Wn. App. at 678.

---

[12]*Martin v. Port of Seattle*, 64 Wn.2d 309, 391 P.2d 540 (1964) (finding a taking occurred through excessive aircraft noise and vibrations), *cert. denied*, 379 U.S. 989 (1965); *Papac v. Montesano*, 49 Wn.2d 484, 303 P.2d 654 (1956) (finding a taking when land was damaged by the flooding of surface waters); *Docksteader v. Centralia*, 3 Wn.2d 325, 100 P.2d 377 (1940) (finding a taking when the city constructed a 12-foot-high viaduct in front of property depriving it of all access); *State ex rel. Moline v. Driscoll*, 185 Wash. 229, 53 P.2d 622 (1936) (finding that hotel owner had a cause of action when the city planned to eliminate 8 feet of a 14-foot sidewalk and drop the grade of the street by 15 feet).

Applying these principles, Northlake's injury is limited to the loss of a monthly lease for parking with Fremont Dock. The loss of this month-to-month tenancy is not the equivalent of a compensable property right; the fact that a city ordinance requires Northlake to provide parking for its customers does not mean that the City is responsible for providing that parking. Moreover, Northlake has not provided this court with any evidence that the loss of parking has impacted the value of its property or that substitute parking is unavailable, thereby depriving it of access.[13] Absent such evidence, Northlake has not provided evidence of the deprivation of a compensable property interest or resulting damage to its property. Therefore, Northlake's claim of inverse condemnation on the grounds that it has lost its parking was correctly dismissed by the trial court as a matter of law.

Northlake also argues that inverse condemnation has occurred through virtue of the City's agreement to purportedly dispense with normal land use regulations and procedures pursuant to the agreement. Under certain circumstances, land use regulations may be challenged as unconstitutional takings. "A regulation effects a taking of private property if 'it "does not substantially advance legitimate state interests, . . . or denies an owner economically viable use of his land." ' " *Sintra, Inc. v. Seattle*, 119 Wn.2d 1, 16, 829 P.2d 765 (1992) (quoting *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 485, 94 L. Ed. 2d 472, 107 S. Ct. 1232 (1987) (quoting *Agins v. Tiburon*, 447 U.S. 255, 260, 65 L. Ed. 2d 106, 100 S. Ct. 2138 (1980))).

■ ■ Northlake's claim raises several concerns. Constitutional issues in civil cases not considered at trial will not be considered on appeal unless the jurisdiction of the court is at issue. *Bernstein v. State*, 53 Wn. App. 456, 767

---

[13]Northlake has submitted affidavits of business tenants on Northlake Way regarding the unavailability of the parking in the disputed lot, but no evidence as to the availability of substitute parking.

P.2d 958, *review denied*, 112 Wn.2d 1024 (1989). Although Northlake's owner submitted affidavits discussing his concern over the agreement's effect on development by Fremont Dock and Quadrant Corporation, it is not clear from the record whether this was ever argued at trial in conjunction with the inverse condemnation theory.[14] Even if this court should choose to proceed and review Northlake's claim, the record lacks evidence on which to make an adequate review. Allegations of fact without support in the record will not be considered by an appellate court. *Lewis v. Mercer Island*, 63 Wn. App. 29, 32, 817 P.2d 408, *review denied*, 117 Wn.2d 1024 (1991). The agreement does contain provisions granting development credits to the developers, but the City correctly points out that Northlake has not provided this court with any evidence that future development by Fremont Dock and Quadrant Corporation will deviate from standards required by law. Accordingly, Northlake's claim of inverse condemnation on this theory is groundless.

We affirm the trial court judgment as to lots 10, 11, 17, and 18. We reverse the trial court judgment as to lot 19 and remand for determination of Northlake's interest in lot 19 and the adjacent portion of the right of way. We affirm the trial court's dismissal of Northlake's constitutional and inverse condemnation claims.

SCHOLFIELD and KENNEDY, JJ., concur.

---

[14]The memorandum opposing defendants' summary judgment on that issue relied solely on the loss of the parking lease.

## APPENDIX A

# HEBRANK
# AND
# ASSOCIATES

Albert J. Hebrank, PLS
Jon P. Warren, PLS

Professional Surveyors ☐ Central Building, Suite 355, 810-3rd Avenue ☐ Seattle, WA 98104 ☐ (206)-447-1729

Surveyor's Sketch

Illustrating Items 8 and 9
Affadavit of Albert Hebrank

## Appendix B

DENNY & HOYT'S
SUPPLEMENTAL PLAT
TO THE CITY OF
SEATTLE, W.T.

Scale 12 feet - 1 inch
Reasoning Scale 60 ft - 1 in

Gardner & Hogg
Civil Engineers

DRAVIS ST

ETRURIA ST

LAKE AVE.

LAKE UNION

DESCRIPTION

DEDICATION

ACKNOWLEDGMENT

## Appendix C

