[Nos. 2203–2; 2555–2. Division Two. February 8, 1978.]

B & W CONSTRUCTION, INC., *Respondent,* v.
THE CITY OF LACEY, *Appellant.*

B & W CONSTRUCTION, INC., *Appellant,* v.
THE CITY OF LACEY, *Respondent.*

*Kenneth R. Ahlf,* for appellant.

*William Thomas McPhee* and *John McCutcheon Parr,* for respondent.

REED, A.C.J.—The City of Lacey appeals from a judgment and jury verdict of $48,500 upon B & W Construction Company's inverse condemnation action for damages caused as a result of the City's construction of a storm sewer system that discharged effluent upon plaintiff's land. In a companion appeal, consolidated herein, B & W appeals from the denial of attorney's fees and expert witness fees sought under RCW 8.25.075(2). We affirm the judgment, but reverse the order denying the fees.

In the summer of 1973, the City of Lacey widened Ruddell Road from two lanes to four and constructed a storm sewer system nearly the entire length of the road. Ruddell Road bisects the drainage basin to the west of Hicks Lake. B & W owns 33.1 acres of land between Ruddell Road and Hicks Lake which it has held for the prospect of subdivision development since 1962. About 13 acres of the property are on high ground, are wooded, and are composed of sandy loam—a soil with qualities of good percolation and slow runoff of surface water. Most of the rest of the property is a peat bog, some of which had been excavated by B & W, leaving pond water in place of the peat.

Prior to the road widening project, most of the rainfall in the area percolated into the ground, while some worked its way into unkept drainage ditches and ultimately flowed onto land north of B & W's parcel. The widening of the road resulted in an increase in the amount of rainwater captured, most of which is now introduced into the storm sewer system and discharged directly through a new outfall onto B & W's peat bog. Plaintiff's proof was designed to show that the discharge of polluted water, debris, and other

material had changed the quality and depth of water in the peat bog so that the property on higher ground had lost much of its value as a potential lakefront subdivision, and that extracting the remaining peat had become more difficult.

## THE CITY'S APPEAL FROM THE JUDGMENT

In its appeal, the City contends (1) that B & W failed to produce evidence of a "substantial injury" such as would support the verdict, (2) that the failure of proof partly relates to the lack of a proper factual basis for hypothetical questions put to one of plaintiff's witnesses, and (3) that the court should have stricken testimony regarding a sale of property which was not sufficiently comparable to establish the value of B & W's land prior to construction.

■■ Where no negligence is charged in the performance of a governmental duty, highway construction resulting in the injurious flow of water upon a citizen's land will support an inverse condemnation action in a proper case. *Papac v. Montesano,* 49 Wn.2d 484, 303 P.2d 654 (1956); *Ulery v. Kitsap County,* 188 Wash. 519, 63 P.2d 352 (1936). The plaintiff need not prove a "substantial injury"; he need only show a "measurable or provable decline in market value." *Highline School Dist. 401 v. Port of Seattle,* 87 Wn.2d 6, 13, 548 P.2d 1085 (1976); *accord, Martin v. Port of Seattle,* 64 Wn.2d 309, 391 P.2d 540 (1964), *cert. denied,* 379 U.S. 989, 13 L. Ed. 2d 610, 85 S. Ct. 701 (1965). We do not understand *Wilber Dev. Corp. v. Les Rowland Constr., Inc.,* 83 Wn.2d 871, 523 P.2d 186 (1974) to require proof of a "substantial injury" in a nontortious, inverse condemnation action. Liability for damages is not limited to the property appropriated, but also includes injury to the remainder of the property not actually taken or damaged. *See Marshland Flood Control Dist. v. Great Northern Ry.,* 71 Wn.2d 365, 428 P.2d 531 (1967).

■ The City's argument that B & W failed to prove injury to its property appears to boil down to a contention

that there was insufficient evidence to support certain factual assumptions made by John F. Boucher, a real estate appraiser whose opinions were essential to. plaintiff's proof of damages. While the record is somewhat ambiguous as to whether a hypothetical question was ever actually posed, we find there was substantial evidence from which the jury could determine the storm sewer discharge had devalued plaintiff's property. A former Lacey city engineer acknowledged in testimony that oil, soapsuds, chemicals, and other matter entering the storm sewer from Ruddell Road would be discharged onto the subject property. Although, in preparing an environmental impact statement for the project, he had predicted the overall effect of effluent discharge upon the property would be "negligible," he had not tested the quality of the water in the peat bog either before or after the project. Other witnesses testified the water was both less clear and less pure after the project: it became muddier, with a scum on the surface; "slimy and gooey"— "just a dirty mess"; children no longer swam there. Mr. Boucher himself performed a simple test by dunking white paper into the bog pond, which resulted in the paper being covered with an oily film. A scientific analysis is not always required to establish water pollution. *E.g., Rusch v. Phillips Petroleum Co.*, 163 Kan. 11, 180 P.2d 270 (1947). This is particularly true in the instant case, where the primary effect of the storm sewer discharge was alleged to be visual, *i.e.*, its impact on the clarity of the water in the peat bog. In addition, there was testimony that as a result of the project, the water level in the bog no longer was affected by seasonal variations. The level remained fairly high and it became more expensive to mine the peat.

The evidence provided a sufficient foundation for Mr. Boucher's opinion that the change in the water quality had diminished the value of the upland portion of the property for its highest and best use as a potential lakefront subdivision. Mr. Boucher, as an appraiser, was qualified to give his opinion that residential lots on a clean, attractive lake

would command higher prices than those on a murky, polluted one. The jury, which made its own view of the property, was entitled to consider the testimony and to decide if there had been a diminution of the aesthetic properties of the pond due to the City's construction project.

Defendant's next assignment of error relates to the admission of Mr. Boucher's testimony about the third of four proffered "comparable" sales to establish the market value of the subject property before construction of the storm sewer. Comparable sale No. 3 was in 1975, a few months prior to the trial of this action. The property, 4.47 acres, is located directly across Ruddell Road from the subject property. In terms of location, zoning, projected pattern of growth, vegetation and topography, it was similar to the subject property. It had sold for $7,494 an acre, plus an assessment for sewers which raised the overall price to $9,680 an acre. The comparable property was subdivided into 12 lots, for which a final plat had been approved. Mr. Boucher opined that this comparable sale property was worth more than the subject property per acre, considering the lesser value of the peat bog portion, but that the "upland" portion of the subject property, which could have been subdivided to overlook the lake made from excavating the bog, would have had a greater per acre value than the comparable property, which had no lake. Using the comparative sales approach, Mr. Boucher gave the subject property an overall value before pollution of the lake of $143,000, or $4,500 per acre, based on a figure of $1,300 per acre for the bog portion and $9,000 per acre for the higher ground more suitable for residences. In the after situation, he valued the bog at $650 per acre and the remaining property at $2,500 per acre, for a round total of $46,000. He calculated the overall diminution in value as $97,000; the jury awarded $48,500.

Defendant contends Mr. Boucher was improperly allowed to compare the value of a subdivision platted and sold on a price per lot basis with the raw acreage contained in the "upland" portion of plaintiff's property, without

considering the expense entailed in obtaining governmental approval for a plat.

It is true that, generally speaking, raw acreage cannot be compared for valuation purposes with fully developed town lots, because it would lead to speculation as to present market value. *In re Medina,* 69 Wn.2d 574, 418 P.2d 1020 (1966). The price of developed lots usually includes expenses of subdivision sales and promotion, sewers, streets, utilities, and perhaps sidewalks. The "retail" price of land in the final stages of development is simply not comparable to the price of raw land for which these costs are only projections.

In the instant case, however, we do not think the subject property differed in character sufficiently from that in comparable sale No. 3 to invalidate the comparison. Although the comparable property had been engineered and platted on paper, no further steps had been taken to develop it, *i.e.,* no utilities or roads had been laid and no lots had been staked out. The City stresses that the transaction had involved a deed–release provision whereby the purchaser could buy each of the 12 lots for $2,500, or a total of $30,000. Nevertheless, the land was priced on an acreage basis at $33,500, and we do not think the deed–release procedure advanced the state of development of the comparable property in any way. The real question is whether an attempt was made to compare raw acreage with fully developed lots; in this connection, we note further that the comparable property had been sold without promotional or sales costs for individual lots. The developers of the comparable property, in short, despite having obtained approval of their paper plat, still faced many of the costs of development awaiting B & W. This was not, therefore, a comparison of raw acreage with "town lots of a fully developed subdivision" as forbidden by *In re Medina, supra* at 578. We find no abuse of the court's inherent discretion to admit evidence of the comparable sales to establish value. *State v. Rowley,* 74 Wn.2d 328, 444 P.2d 695 (1968). In any

event, the jury seems not to have fully accepted the plaintiff's evidence of value, because of its award of exactly one-half the diminution testified to by Mr. Boucher.

### THE ATTORNEY AND WITNESS FEES

After entry of the judgment, the court denied plaintiff B & W's motion for an award of attorney's fees and expert witness fees based on RCW 8.25.075(2). B & W appeals in No. 2555-2.

The statute provides, in part, as follows:

Costs—Award to condemnee or plaintiff—Conditions.
. . .
(2) A superior court rendering a judgment for the plaintiff awarding compensation for the *taking* of real property for public use without just compensation having first been made to the owner, . . . shall award or allow to such plaintiff costs including reasonable attorney fees and reasonable expert witness fees.

(Italics ours.) This statute was enacted in Laws of 1971, 1st Ex. Sess., ch. 240, as section 21 of Substitute Senate Bill No. 770 entitled, "Real Property Acquisition—Relocation Assistance for Displaced Persons." It has been held to allow the award of attorney's fees in an inverse condemnation action. *Snohomish v. Joslin,* 9 Wn. App. 495, 513 P.2d 293 (1973). The bill was a response to, and is a virtual verbatim copy of the federal act pertaining to uniform relocation assistance and real property acquisition, 42 U.S.C. § 4601 (1971) *et seq.,* which requires state and local governments to pay property owners for their relocation expenses as a condition to the disbursement of federal funds to assist in the acquisition of real property.

The parties' argument to the trial court on this issue was focused on whether the statute was intended to allow recovery of fees when there had been a *damaging,* but not a *taking* of property, with the City of Lacey arguing that there had been at most a showing of a damaging for which no fees could be awarded and, alternatively, challenging certain of the fee amounts claimed by plaintiff. The judge stated that he agreed with the City's primary position, but

appeared to deny the claim on the additional basis that the statutory section allowing attorney's fees and expert witness fees is unlike the title and the remainder of the bill and runs afoul of article 2, section 19 of our constitution providing that no bill "shall embrace more than one subject, and that shall be expressed in the title."

We disagree that section 21 of the statutory enactment is so incongruous when considered with the rest of the act that it violates the constitutional prohibition against multiple coverage of subjects in a single bill. The purposes of the act entitled "Real Property Acquisition—Relocation Assistance for Displaced Persons" are declared in section 1 thereof (codified as RCW 8.26.010):

> RCW 8.26.010 Purposes. The purposes of this chapter are:
> (1) To establish a uniform policy for the fair and equitable treatment of persons displaced as a result of public works programs of the state and local governments in order that such persons shall not suffer disproportionate injuries as a result of programs designed for the benefit of the public as a whole; and
> (2) To encourage and expedite the acquisition of real property for public works programs by agreements with owners, to reduce litigation and relieve congestion in the courts, to assure consistent treatment for owners affected by state and local programs, and to promote public confidence in state and local land acquisition practices.

Generally, the act defines a "displaced person" as one who is forced to move himself or his personal property as a result of his real property being acquired or ordered vacated by a public agency, and provides for payment by the public agency of expenses incurred in relocating his abode or his personal property. It sets up a procedure for appraisal of the property and negotiation of the amount of just compensation. We are convinced that there is a "rational unity" between the title and general subject of this bill and section 21 thereof, relating to the award of attorney's fees and witness fees in the event the court awards just compensation where such was not paid to the

owner whose real property was taken. *Kueckelhan v. Federal Old Line Ins. Co.*, 69 Wn.2d 392, 403, 418 P.2d 443 (1966).

In its motion for recovery of fees, B & W acknowledges that the United States Constitution, in the Fifth Amendment, requires just compensation for the *taking* of private property, and the federal statute from which Substitute Senate Bill No. 770 was copied allows fees for an action involving a "taking" but does not mention a "damaging." Our state constitution, on the other hand, provides in article 1, section 16 (amendment 9) for compensation for a damaging as well, but the state statute before us omits mention of fees in an action in which a "damaging" has been found. Whether or not the omission of reimbursement for fees incurred in an action involving a "damaging" was inadvertent when the state legislature copied the federal statute, it is at least clear that, for some purposes in inverse condemnation cases, our Supreme Court has abolished the distinction between a "taking" and a "damaging." *Highline School Dist. 401 v. Port of Seattle, supra* at 11; *but see Wandermere Corp. v. State,* 79 Wn.2d 688, 488 P.2d 1088 (1971).

▇ The City emphasizes that in California, which also enacted a relocation assistance statute containing a fee recovery clause similar to ours and has a like constitutional provision, the courts have confined the award of such fees to cases involving the taking, but not damaging, of real property, on the grounds that the legislature "did not see fit to permit the claimed costs or attorneys' fees for other than a 'taking.'" *Stone v. Los Angeles,* 51 Cal. App. 3d 987, 124 Cal. Rptr. 822, 829 (1975); *accord, Holtz v. San Francisco Bay Area Rapid Transit Dist.,* 52 Cal. App. 3d 88, 124 Cal. Rptr. 815 (1975).[1] *See also Parker v. Los*

---

[1] The California Court of Appeal opinion in *Holtz v. San Francisco Bay Area Rapid Transit Dist.,* 52 Cal. App. 3d 88, 124 Cal. Rptr. 815 (1975), was subsequently vacated upon a determination that withdrawal of lateral support was a

*Angeles,* 44 Cal. App. 3d 556, 118 Cal. Rptr. 687 (1975). The answer to this, however, is that the diminution in value of real property due to flooding or the collection and discharge of water upon it caused by public construction has been deemed a "taking" of that land for which just compensation must be paid, *United States v. Kansas City Life Ins. Co.,* 339 U.S. 799, 94 L. Ed. 1277, 70 S. Ct. 885 (1950); *Wilber Dev. Corp. v. Les Rowland Constr., Inc., supra; see Ulery v. Kitsap County, supra* at 523. California has specifically approved the recovery of fees under its statute by inverse condemnation plaintiffs in a case markedly similar on its facts to this action, where the plaintiffs' land was "taken" by the discharge of drainage waters but plaintiffs were not forced to relocate. *Mehl v. People ex rel. Dep't of Public Works,* 13 Cal. 3d 710, 532 P.2d 489, 119 Cal. Rptr. 625 (1975).

Likewise, we think a "taking" has occurred here. The court's "Judgment and Decree of Appropriation" recognizes that the City of Lacey has acquired the right to discharge effluent from its storm sewer upon B & W's land, and a jury has awarded compensation for the taking of that right and the resultant injury to plaintiff's proposed subdivision. Without resolving whether our application of the statute would be the same had the property been "damaged" but not "taken," if indeed such a distinction can still be drawn in the inverse condemnation field, we hold that B & W is entitled to its attorney's and expert witness fees under RCW 8.25.075(2).

B & W is allowed its attorney's fees and witness fees in the amount of $13,284, as approved for the Superior Court proceedings by the trial judge in the event he had decided the statute applied. In addition, attorney's fees accrued in this consolidated appeal are allowed in the claimed amount of $3,108. *Snohomish v. Joslin, supra.*

---

"taking" of an interest in real property, 17 Cal. 3d 648, 552 P.2d 430, 131 Cal. Rptr. 646 (1976).

The judgment is affirmed; the denial of statutory fees to B & W is reversed.

PETRIE, J., and WORSWICK, J. Pro Tem., concur.