105 P.3d 26 (2005)
153 Wash.2d 530
James K. DICKGIESER, a single man; Milo A. Dickgieser and Joan Dickgieser, husband and wife; and Sherrie M. Shold, a married woman; Petitioner,
v.
STATE of Washington, Respondent.
No. 74619-2.
Supreme Court of Washington, En Banc.
January 27, 2005.
*27 Jay Allan Goldstein, Olympia, for Petitioner.
Mark Conlin Jobson, Olympia, Respondent.
Andrew C Cook, Olympia, for Amicus Curiae Building Industry Ass'n of Wash.
John Maurice Groen, Diana M Kirchheim, Groen Stephens & Klinge LLP, Bellevue, for Amicus Curiae Pacific Legal Foundation.
MADSEN, J.
This case involves an inverse condemnation action by James, Milo and Joan Dickgieser (the Dickgiesers) against the State of Washington for damage to the Dickgiesers' property allegedly caused when the Department of Natural Resources (Department) logged or allowed logging on state forest lands located adjacent to the Dickgiesers' land. The trial court granted summary judgment in favor of the Department, holding the Dickgiesers had failed to establish the "public use" element of their inverse condemnation claim. The Court of Appeals affirmed on the basis that the Department's logging of its land was a "public benefit" not a "public use." We reverse the Court of Appeals and remand to the trial court for further proceedings.

FACTS
The Dickgiesers own approximately 12 acres in Jefferson County, adjacent to state *28 forest lands managed by the Department. A stream runs downhill through the Department's upland property and then through the Dickgiesers' property.
When the Dickgiesers learned that the Department was planning to log its land, the Dickgiesers expressed their concerns to the Department that the logging would cause the stream to flood and cause damage to their property. To allay these concerns and to prevent future problems, the Department agreed to construct safeguards[1] to the stream bed on the Dickgiesers' property in exchange for an easement across the Dickgiesers' property to allow better access to the Department's upland parcel.[2] The agreement required the Dickgiesers to maintain the stream bed improvements, including the removal of deposited sediments and gravel as needed. Although the Department did construct some safeguards in and around the stream on the Dickgiesers' property, the Dickgiesers allege that the Department did not do all it promised and that the work was inadequate and incomplete.
During 1996, the Department logged or allowed logging on its property. During the winter following the logging, the stream on the Dickgiesers' property overflowed its banks and damaged three homes on their property, the septic system, and the domestic water supply.[3] The Dickgiesers claim that since the logging they have experienced flooding every winter and spring. The Dickgiesers' experts predict repeated, permanent, and chronic flooding of their property as a result of the logging.
The Dickgiesers sued the Department for negligence, nuisance, waste, and inverse condemnation. However, because the statute of limitations had run on the negligence and nuisance claims the parties stipulated to the dismissal of those claims. The trial court dismissed the Dickgiesers' waste claim because it was time barred and, alternatively, because the pleadings failed to state a claim for which relief could be granted. As to the inverse condemnation claim, the trial court observed that the Dickgiesers' submissions raised "issues of fact regarding whether or not there's permanent or continuing damage and whether or not such would amount to a constitutional taking and whether there are issues of fact as to whether the State would have the defense provided by the common enemy, outlaw surface water doctrines and so on." Clerk's Papers (CP) at 178. However, the court granted summary judgment to the Department, holding that the Department's logging activity was not a public use.
The Dickgiesers appealed the dismissal of their inverse condemnation claim. Dickgieser v. State, 118 Wash.App. 442, 443, 76 P.3d 288, 289 (2003). Relying on this court's analysis in Manufactured Housing Communities of Washington v. State, 142 Wash.2d 347, 13 P.3d 183 (2000), the Court of Appeals concluded the Department's logging of its land provided a "public benefit," but was not a "`public use.'" Dickgieser, 118 Wash.App. at 447, 76 P.3d 288. The court affirmed the summary judgment, holding the Dickgiesers failed to establish the "public use" element of its inverse condemnation claim as a matter of law. Id. at 448, 76 P.3d 288. The Dickgiesers petitioned for discretionary review. The Building Industry Association of Washington, the Pacific Legal Foundation, and the Fitzpatrick Family have filed amicus briefs.

ANALYSIS
Washington's constitution provides that "[n]o private property shall be taken or damaged for public or private use without just compensation having been first made." Const. art. I, § 16. The term "inverse condemnation" is used to describe an action alleging a governmental "taking" or "damaging" that is brought to recover the value of property which has been appropriated in fact, but with no formal exercise of the power of eminent domain. Phillips v. King County, *29 136 Wash.2d 946, 957, 968 P.2d 871, 876 (1998) (quoting Lambier v. City of Kennewick, 56 Wash.App. 275, 279, 783 P.2d 596 (1989)); Granite Beach Holdings, L.L.C. v. Dep't of Natural Resources, 103 Wash.App. 186, 205, 11 P.3d 847 (2000).
The elements required to establish inverse condemnation are: (1) a taking or damaging (2) of private property (3) for public use (4) without just compensation being paid (5) by a governmental entity that has not instituted formal proceedings. Phillips, 136 Wash.2d at 957, 968 P.2d 871. The taking or damaging of property to the extent that it is reasonably necessary for the maintenance and operation of other property devoted to a public use is a taking or damaging for a public use and subject to the provisions of article I, section 16, of the Washington State Constitution. Ackerman v. Port of Seattle, 55 Wash.2d 400, 413, 348 P.2d 664 (1960), overruled on other grounds in Highline School Dist. No. 401, King County v. Port of Seattle, 87 Wash.2d 6, 548 P.2d 1085 (1976); Boitano v. Snohomish County, 11 Wash.2d 664, 668, 120 P.2d 490 (1941); Decker v. State, 188 Wash. 222, 227, 62 P.2d 35 (1936). In this case the trial court granted summary judgment to the Department because it found the Department's logging activities did not constitute a public use.
This court reviews a grant of summary judgment de novo, viewing the facts in the light most favorable to the nonmoving party, here, the Dickgiesers. Int'l Bhd. of Elec. Workers, Local Union No. 46 v. Trig Elec. Constr. Co., 142 Wash.2d 431, 434-35, 13 P.3d 622 (2000); Folsom v. Burger King, 135 Wash.2d 658, 663, 958 P.2d 301 (1998). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. CR 56(c).
The "question whether the contemplated use be really public shall be a judicial question." Const. art I, § 16; Miller v. City of Tacoma, 61 Wash.2d 374, 384, 378 P.2d 464, 470 (1963). Although the legislature may declare that a particular use of property is a "public use," that determination is not dispositive. Hallauer v. Spectrum Props. Inc., 143 Wash.2d 126, 139, 18 P.3d 540 (2001). The "words `public use' are neither abstractly nor historically capable of complete definition. The words must be applied to the facts of each case in the light of current conditions." Miller, 61 Wash.2d at 384, 378 P.2d 464.
In affirming the trial court's conclusion that logging is not a public use, the Court of Appeals reasoned that
the logs themselves were not put to a public use; the land was not used for a public use; the stream revisions were not for a public use (for example, a road or park). Rather, like Manufactured Housing and [In re] City of Seattle, [96 Wash.2d 616, 638 P.2d 549 (1981)], the logging provided a public benefit but was not a public use.
Dickgieser, 118 Wash.App. at 447, 76 P.3d 288. "Viewed another way," the court said, "the Department logged this property to produce income and manage its assets. It did not log the property to create an area for public use. Thus, the logging was not a public use." Id. at 447, 76 P.3d 288.
Initially, we note that the Department does not dispute that logging of state forest lands is a public use. Further, the parties did not rely on Manufactured Housing, 142 Wash.2d 347, 13 P.3d 183 or In re City of Seattle, 96 Wash.2d 616, 638 P.2d 549 (1981) in briefing to the Court of Appeals. In Manufactured Housing we considered whether chapter 59.23 RCW, granting tenants of mobile home parks a right of first refusal when park owners sought to sell, constituted a public use for which compensation should be paid. We held that securing housing for a segment of society might be a public benefit but it did not qualify as a public use since members of the public would be excluded from the park, which would be privately owned by the residents. Although the right to exclude others was discussed, Manufactured Housing does not stand for the proposition that an inverse condemnation occurs only if individual members of the public are entitled to actually use the subject land. To the contrary, public use has been found where the property taken was not open for use to the public. There are many examples *30 of public use that do not involve physical use of land by members of the public including: public utilities and the production of hydroelectric power, City of Tacoma v. Humble Oil & Refining Co., 57 Wash.2d 257, 258, 356 P.2d 586 (1960), State ex rel. Northwestern Electric Co. v. Superior Court, 28 Wash.2d 476, 183 P.2d 802 (1947); appropriation of water and facilities to generate electrical power to sell to the public, Public Utility District No. 1 of Chelan County v. Washington Water Power Co., 43 Wash.2d 639, 262 P.2d 976 (1953); operation of a gravel pit on state lands, Boitano, 11 Wash.2d at 668, 120 P.2d 490; operation and maintenance of a garbage incinerator, Jacobs v. City of Seattle, 93 Wash. 171, 177, 160 P. 299 (1916); and construction and operation of sewage disposal plants, Snavely v. City of Goldendale, 10 Wash.2d 453, 117 P.2d 221 (1941); Aliverti v. City of Walla Walla, 162 Wash. 487, 298 P. 698 (1931); Southworth v. City of Seattle, 145 Wash. 138, 259 P. 26 (1927).
In contrast to Manufactured Housing and In re City of Seattle, the logging activities in this case were taking place on public lands, managed by the Department of Natural Resources. Public lands include state forest lands. RCW 79.02.010(9). RCW 79.02.010(11) defines state lands as "lands acquired under RCW 79.22.010, 79.22.040 and 79.22.020." Former RCW 79.01.004 (2000) provides that such lands "are lands belonging to or held in trust by the state." Further, RCW 79.22.010 authorizes the Department to acquire land for reforestation and provides that "such lands shall be held in trust, protected, managed, and administered upon, and the proceeds therefrom disposed of, under RCW 79.22.040." The Department may contract for timber harvesting and is authorized to sell timber from this process. RCW 79.22.040; RCW 79.15.500. Although members of the public do not physically use state forest lands, and the timber harvested from state forest lands may not be used in building government structures in the same manner as the gravel in Boitano was used to construct roads, the sale of timber is authorized by statute and the proceeds are placed in a contract harvesting revolving account in the custody of the state treasurer and used for state purposes. See generally ch. 79.15 RCW.
More importantly, Manufactured Housing and In re City of Seattle are inapplicable to the circumstances of this case. Manufactured Housing involved a constitutional challenge to the statute that granted a right of first refusal to tenants of mobile home parks. The state argued that, rather than invalidating the statute, the appropriate remedy was to require that just compensation be paid for the taking. 142 Wash.2d at 371, 13 P.3d 183. This court rejected the state's argument, holding the statute resulted in the state transferring ownership of the property from one private owner, the park owner, to another private owner, the tenants of the park. This, we held, did not constitute a public use. In In re City of Seattle, 96 Wash.2d 616, 638 P.2d 549, the City sought to condemn private property to erect an "urban shopping center" with facilities that would be leased for private use as retail establishments, restaurants, or theaters. Id. at 633, 634, 638 P.2d 549. This court held that the project was primarily a private undertaking and the use was essentially a private one. Id. at 629, 638 P.2d 549. We said that while the project provided a public benefit, it did not constitute a public use and therefore, the City's power of eminent domain could not be invoked. Id. at 627, 638 P.2d 549.
Unlike the circumstances in Manufactured Housing or In re City of Seattle, the Department in this case did not condemn property for the purpose of logging, which it had no authority to do. Rather, the taking alleged here is damage to neighboring land that necessarily resulted from the Department's logging operations on its own lands.
It is well settled that inverse condemnation can occur where damage to private property results from governmental activity reasonably necessary to the proper maintenance of other property already devoted to a public use, thus satisfying the public use element of the claim. In Decker, 188 Wash. at 224, 62 P.2d 35, the State cut a roadway across the plaintiff's property in order to provide water to the state hospital on the adjoining property. This court determined that use of the plaintiff's property was reasonably *31 necessary to the operation and maintenance of the hospital and, thus, a taking for a public use. Decker, 188 Wash. at 227, 62 P.2d 35. Similarly, in Ackerman v. Port of Seattle, where the court determined that the continuous and frequent low flights over Ackerman's land amounted to a taking, the court observed:
Having the power to acquire an approach way by condemnation, the Port, allegedly, failed to exercise that power, with the result that the appellants' private airspace is allegedly being used as an approach way, without just compensation first having been paid to them. Clearly, an adequate approach way is as necessary a part of an airport as is the ground on which the airstrip, itself, is constructed, if the private airspace of adjacent landowners is not to be invaded by airplanes using the airport. The taking of an approach way is thus reasonably necessary to the maintenance and operation of the airstrip.
Ackerman, 55 Wash.2d at 413, 348 P.2d 664.
Finally, in Boitano, this court examined whether Snohomish County had effected a taking of property through its operation of a gravel pit from which it obtained materials for road construction. The court concluded that
[t]he use of land for a gravel pit by a county of this state is undoubtedly a public use, for, by Rem.Rev.Stat., Vol. 7A, § 6450-9.
"Whenever it is necessary to secure any lands ... for any borrow pit, gravel pit, quarry or other land for the extraction of material for county road purposes or right of way for access thereto, the board of county commissioners is authorized to acquire such lands on behalf of the county by gift, purchase, or condemnation."
(Citations omitted.) Boitano, 11 Wash.2d at 668, 120 P.2d 490. In its analysis, the court discussed several cases in which the operation of an enterprise for the public benefit resulted in damage to adjacent property and thus a compensable taking under article I, section 16. Id. at 672-77, 120 P.2d 490. These activities included the operation of an incinerator on public land which caused damage to the adjacent land when garbage was burned, Jacobs, 93 Wash. 171, 160 P. 299, and the operation of sewage treatment plants near privately owned land, Snavely, 10 Wash.2d 453, 117 P.2d 221, Southworth, 145 Wash. 138, 259 P. 26, and Aliverti, 162 Wash. 487, 298 P. 698.
After concluding that the use of land for a gravel pit by the county constituted a public use, the court addressed the question of whether the flooding of the Boitano property was reasonably necessary to the operation of the County's gravel pit. Boitano, 11 Wash.2d at 671, 120 P.2d 490.
In using appellants' land for the disposal of the water from its own premises, the county was devoting that land to a public use incidental to its operation of the gravel pit in order to obtain material necessary for the construction and maintenance of its highways. In proceeding as it did, the county was not acting tortiously, or in a negligent manner, but was exercising its power of eminent domain, even though it did not take legal steps to condemn the land before damaging it for a public use.
Boitano, 11 Wash.2d at 671, 120 P.2d 490.
In each of these cases, the damage occurring to private property was reasonably necessary to the proper maintenance of other property already devoted to a public use and thus the requirement that the property be taken for a public use was satisfied. Analogous to the statute noted in Boitano, RCW 79.36.310 authorizes the Department to acquire by gift, purchase, exchange or condemnation property or use of a road the State considers necessary in order to gain access to state timber lands.[4] This statute indicates *32 that the legislature contemplated the need to use private lands adjacent to state forest lands in order to carry on activities such as logging. We conclude that damage to private property that is reasonably necessary to log state lands is for a public use, requiring compensation under article 1, section 16.
The Department argues, however, that the Dickgiesers claimed only that the Department was negligent in logging its own land and they have not argued that the damage to their property was reasonably necessary to effectuate a public use. The Department says that if the Dickgiesers' property was negligently damaged by the careless logging practices of the Department, then the negligent damaging was not a taking of land for anyone's use because the Department's interference with the Dickgiesers' property was not a necessary incident of the state's activities. Citing Olson v. King County, 71 Wash.2d 279, 428 P.2d 562 (1967), the Department argues that every trespass or tortious damaging of real property does not become a constitutional taking or damaging merely because the government is involved. Rather, a taking occurs only if the state's interference with another's property is a "necessary incident" to the public use of the State's land. Id. at 285, 428 P.2d 562.
The Department is correct that governmental torts do not become takings simply because the alleged tortfeasor is the government. N. Pac. Ry. v. Sunnyside Valley Irrigation Dist., 85 Wash.2d 920, 540 P.2d 1387 (1975). However, the Dickgiesers have not simply raised a negligence claim. Although the Department quotes portions of the Dickgiesers' complaint that, read in isolation suggest that the Dickgiesers claimed their damages resulted from the Department's negligent logging of its land, the record as a whole shows their claim of negligence relates to the Department's alleged negligence in conducting stream bed work on the Dickgiesers' property, not negligence in logging its own land. The Department's contention that the Dickgiesers' inverse condemnation claim is merely a negligence action is not persuasive.
Moreover, the record contains evidence that the Department did not conduct its logging in a negligent manner and that the increased volume and rapid water runoff from the logged land onto the Dickgiesers' property was an inevitable consequence of logging. The declaration of M. Joan Dickgieser states that the Department told her it would not address the drainage problems expected as a result of the logging if the Dickgiesers did not sign an easement and that the Dickgiesers' property would be flooded worse than before. In addition, it is undisputed that the logging created changes to surface flows. As the Dyrland affidavit submitted by the Dickgiesers noted, the removal of timber vegetation increased surface runoff by altering the subsurface drainage:
The subsurface drainage was disturbed in the upper part of the watershed by removal of mature tree cover and by ground disturbance through logging by the State of Washington. Removing vegetation from the upper watershed increased the saturation level of soil and subsurface materials in the watershed that was inherently unstable. Increased saturation levels coupled with sustained rainfall further increased the risk of high runoff, slope failure, stream channel erosion and scour.
CP at 57, Decl. of Dyrland.
The Dickgiesers have raised a factual question as to whether the resulting damage to the Dickgiesers' property was reasonably necessary in order for the Department to log its land.
Next, the State contends that because the Dickgiesers' claim for inverse condemnation is based on surface water flooding, the Dickgiesers also must produce evidence demonstrating that the Department artificially collected, channeled and discharged surface water onto their property in a manner different from the natural flow, thereby causing substantial injury to the land, citing Phillips v. King County, 136 Wash.2d 946, 958-59, 968 P.2d 871 (1998).
A governmental body ordinarily is not liable for consequential damages to neighboring properties due to increased surface *33 water flows if the damages arise only from changes in the character of the surface resulting from the opening of streets and public facilities. Id. at 958, 968 P.2d 871. However, the government may be liable if it concentrates and gathers water into artificial drains or channels and discharges it upon adjoining lands in quantities greater than or in a manner different from the natural flow. 18 EUGENE MCQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 53.144, at 538 (3d rev. ed.1963). Further, the flow of surface water along natural drains may be hastened or incidentally increased by artificial means, so long as the water is not ultimately diverted from its natural flow on the other's property. Phillips, 136 Wash.2d at 959, 968 P.2d 871. In Wilber Development Corp. v. Les Rowland Construction, Inc., 83 Wash.2d 871, 876, 523 P.2d 186 (1974) this court held that if water is "collected and deposited upon the land in a different manner" than before development, compensation to the property owner may be required. Thus, in the proper case, damage caused by surface water may support an inverse condemnation action. B & W Constr., Inc. v. City of Lacey, 19 Wash.App. 220, 223, 577 P.2d 583 (1978). The record here shows that there are material facts in dispute regarding whether the Department's logging activity concentrated and gathered water into artificial channels or drains and discharged it onto the Dickgiesers' land in quantities greater than or in a different manner than the natural flow. See, e.g., CP at 57, Decl. of Dyrland.

CONCLUSION
Based on the foregoing we conclude that summary judgment was improperly granted in favor of the Department.
Finally, the Dickgiesers request reasonable attorney fees and costs pursuant to RAP 18.1, RCW 8.25.070(4), and Sintra, Inc. v. City of Seattle, 131 Wash.2d 640, 666, 668, 935 P.2d 555 (1997). RCW 8.25.070 allows a condemnee to recover attorney and expert witness fees after a trial is held fixing the amount of fees to be awarded. Here, a trial was never held to determine whether the Department took the Dickgiesers' property, or the amount of the fees to be awarded; rather, the trial court dismissed the Dickgiesers inverse condemnation claim on summary judgment because it concluded the Departments logging of public lands was not a public use. Thus, we decline to consider attorney fees at this time.
The Court of Appeals is reversed and the case is remanded for further proceedings.
ALEXANDER, C.J., JOHNSON, SANDERS, BRIDGE, CHAMBERS, OWENS, FAIRHURST, JJ., and IRELAND, J.P.T., concur.
NOTES
[1] The safeguards consisted of dredging and rechanneling the stream bed, constructing two settling ponds and purchasing and installing a 30 foot or equivalent culvert. This work was to be done before any timber harvesting.
[2] The agreement was never formalized and the State does not claim that the Dickgiesers provided an easement.
[3] The domestic water supply was obtained from the stream.
[4] RCW 79.36.310 provides: Whenever the department finds that it is in the best interests of the state of Washington to acquire any property or use of a road in private ownership to afford access to state timber and other valuable material for the purpose of developing, caring for, or selling the same, the acquisition of such property, or use thereof, is hereby declared to be necessary for the public use of the state of Washington, and the department is authorized to acquire such property or the use of such roads by gift, purchase, exchange, or condemnation, and subject to all of the terms and conditions of such gift, purchase, exchange, or decree of condemnation to maintain such property or roads as part of the department's land management road system.