IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| JON GIBSON AND MARY LOIS GIBSON, husband and wife, and WESLEY HILL AND JEANNA HILL, husband and wife, d/b/a MONTGOMERY COURT APARTMENTS, | ) ) ) ) ) ) | No. 30802-2-III |
| Appellants, | ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| CITY OF SPOKANE VALLEY, a municipal corporation, | ) ) ) ) | |
| Respondent. | ) | |

KULIK, J. — Jon and Mary Gibson sued the city of Spokane Valley (the City), alleging the City inversely condemned their apartment complex by constructing a roundabout that restricted access to the apartments. The trial court granted the City's motion for summary judgment dismissal and denied the Gibsons' motion for reconsideration. The Gibsons appeal, contending there are genuine issues of material fact regarding the severity of the access restrictions on the property. They also contend that the trial court erred in dismissing an equitable estoppel claim. We agree with the trial

court that the access, while more circuitous, does not result in compensable damage but we conclude that the trial court improperly dismissed the equitable claim. Therefore, we affirm the summary judgment in favor of the City on all claims except the promissory estoppel claim. We reverse dismissal of that claim and remand for trial.

## FACTS

Jon and Mary Gibson own the Montgomery Court Apartments, a commercial apartment complex at 2301 N. Wilbur Road in the City. The southeast corner of the apartment complex abuts the three-way intersection of East Montgomery Drive, North Wilbur Road, and East Mansfield Street. The apartments have one driveway to access the complex, which is located on Wilbur north of the roundabout at issue here.

In 2003, Spokane County[1] approached the Gibsons on behalf of the City seeking an easement on their property to modify the intersection to improve traffic congestion in the area of the Pines-Indiana-Montgomery I-90 interchange. The Gibsons eventually reached an agreement with the City and executed the requested easement and a right-of-way deed in exchange for $69,000.

In 2008, the City built a three-way roundabout at the intersection, which prohibited traffic traveling east on Montgomery from making a left turn onto Wilbur to access the

---

[1] At that time, the project area was an unincorporated portion of Spokane County.

2

apartments. Instead, travelers were required to turn left onto Jackson Avenue to reach Wilbur. Inga Note, a senior traffic engineer for the City, explained that the roundabout was designed so people could access Wilbur from Jackson and that the City installed a sign at the Jackson intersection to indicate this access to Wilbur. When the Gibsons realized the roundabout would limit vehicles traveling east on Montgomery from using Wilbur to access the apartments, they sent a letter to the City revoking the authorization to record the easement and returned the $69,000. According to the Gibsons, most existing and prospective tenants used Montgomery to access Wilbur Road and the Montgomery apartments.

The Gibsons filed a claim for damages with the City, alleging it inversely condemned the apartment complex by restricting the right of access to the complex. A commercial real estate appraiser retained by the Gibsons estimated that the market value of the apartments was reduced by $1,325,000 as a result of the impact from lost access due to the roundabout. The Gibsons also raised claims for misrepresentation, damages arising from construction of the roundabout, and estoppel, asking that the City be estopped "from denying compensation to [the Gibsons] for the costs of constructing a new access on Montgomery." Clerk's Papers (CP) at 8. They alleged that they had spent time and money in obtaining estimates for a second access in reliance on representations

3

by the City.

Both parties filed motions for partial summary judgment. The Gibsons argued "[t]here is no issue of material fact that the Plaintiffs have been deprived access to their property from E. Montgomery Dr. . . . through the construction of the roundabout." CP at 606. They argued that the City engaged in an unconstitutional taking of their property because access to the apartments from Montgomery had been "completely eliminated." CP at 607. They alleged, "[t]he majority of potential renters that become tenants at Montgomery Court Apartments learn of apartment availability by driving by the complex, and their inability to access the entrance has caused a severe reduction in rentals, and increased costs of advertising." CP at 598. Hank Borden, a civil engineer, submitted a declaration in support of the Gibsons' motion, stating that "a driver unfamiliar with the area would have difficulty locating that [Wilbur] entrance." CP at 423.

The City countered that the inverse condemnation claim should be dismissed because alteration of traffic flow by the apartment complex was not a compensable deprivation of a property right under Washington law. Specifically, it pointed out that Washington cases distinguish between impairment of access on and off property from noncompensable alterations of traffic flow to and from an owner's property, noting that in

4

this case there had "been no change at all in the ability of motorists to drive onto and exit the apartment parcel by way of its entrance on Wilbur." CP at 338. The City pointed out that the Gibsons lost traffic flow in one direction, but that there had been no change for drivers headed westbound, which constituted the majority of traffic.

The court granted the City's motion for summary judgment and dismissed the Gibsons' claims for inverse condemnation and equitable relief, noting that access from Wilbur, the directly abutting street, remained unrestricted. It concluded, "[t]he placement and resulting re-routing caused by the round-about, although curious and unfortunate, does not create a circumstance that as a matter of law leaves plaintiffs with a remedy." CP at 796. The court denied the dismissal of the misrepresentation claim and the Gibsons' motion for partial summary judgment.

The Gibsons moved for reconsideration, arguing that as abutting property owners to Montgomery, they were entitled to per se compensation based on the impaired access. The court denied the Gibsons' motion for reconsideration. The Gibsons later moved for voluntary dismissal of the remaining claims. The Gibsons appeal the dismissal of their claims for inverse condemnation and equitable relief.

5

ANALYSIS

*Summary Judgment.* The Gibsons maintain that they presented sufficient evidence to raise genuine issues of material fact regarding the severity of the access restrictions imposed by the City's construction of the roundabout. Specifically, they contend that the effect of the roundabout constitutes a compensable taking under the Washington Constitution because access to their property from Montgomery Road has been "totally eliminated" and access from Wilbur has been substantially impaired, resulting in a de facto partial closure of the street. Br. of Appellants at 20.

This court reviews summary judgment orders de novo. *Ranger Ins. Co. v. Pierce County*, 164 Wn.2d 545, 552, 192 P.3d 886 (2008). We will affirm an order granting summary judgment if, when viewing the evidence in a light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); *Ranger*, 164 Wn.2d at 552. When reviewing a summary judgment order, this court engages in the same inquiry as the trial court, considering the facts and all reasonable inferences from the facts in the light most favorable to the nonmoving party. *Right-Price Recreation, LLC v. Connells Prairie Cmty. Council*, 146 Wn.2d 370, 381, 46 P.3d 789 (2002). The party opposing summary judgment "may not rely on speculation, argumentative assertions that unresolved factual

issues remain, or having its affidavits considered at face value." *Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 13, 721 P.2d 1 (1986).

*Inverse Condemnation.* "No private property shall be taken or damaged for public or private use without just compensation having been first made." CONST. art. I, § 16. An inverse condemnation claim is an action that seeks to recover the value of the property that the government appropriated without a formal exercise of its eminent domain powers. *Fitzpatrick v. Okanogan County*, 169 Wn.2d 598, 605, 238 P.3d 1129 (2010) (quoting *Dickgieser v. State*, 153 Wn.2d 530, 534-35, 105 P.3d 26 (2005)). A party alleging an inverse condemnation must establish (1) a taking or damaging (2) of private property (3) for public use (4) without just compensation being paid (5) by a governmental entity that has not instituted formal condemnation proceedings. *Id.* at 606 (quoting *Dickgieser*, 153 Wn.2d at 535).

"The right of access of an abutting property owner to a public right-of-way is a property right which if taken or damaged for a public use requires compensation under article I, section 16 of the Washington State Constitution." *Keiffer v. King County*, 89 Wn.2d 369, 372, 572 P.2d 408 (1977). The issue of whether compensation must be paid involves a two-step process. "The first is to determine if the government action in question has actually interfered with the right of access as that property interest has been

defined by our law." *Id.* This is a legal question to be answered by the court. *Wandermere Corp. v. State*, 79 Wn.2d 688, 695, 488 P.2d 1088 (1971). If the right of access has been damaged, then the degree of damage is the pivotal issue. *Keiffer*, 89 Wn.2d at 373. The degree of impairment is a question of fact. *Id.* at 374.

To satisfy the first step, a party must show that his or her right of access was either eliminated or substantially impaired. *Id.* This means the party's "reasonable means of access must be obstructed." *Union Elevator & Warehouse Co. v. State*, 96 Wn. App. 288, 296, 980 P.2d 779 (1999). Generally, however, if the landowner retains an alternative route to and from his property, even if it is less convenient, the landowner is not deemed specially damaged. *Hoskins v. City of Kirkland*, 7 Wn. App. 957, 960-61, 503 P.2d 1117 (1972).

The question before us is whether access to and from the apartment complex has been damaged under the law. Not all impairments of access to property are compensable. Washington cases distinguish between true impairment of access, which relates to access on and off an owner's property, from noncompensable alterations of traffic flow to and from an owner's property:

> [D]istinctions are made between the restriction of access and related but distinguishable actions which simply regulate the volume or flow of traffic on a public way. Those actions taken pursuant to the police power for the purpose of regulating the flow of traffic *on* the public way itself are

8

generally not compensable.

*Keiffer*, 89 Wn.2d at 372.

Moreover, RCW 47.52.041 provides that no person shall have any claim against a city, state, or county "by reason of the closing of such streets, roads or highways as long as access still exists or is provided to such property abutting upon the closed streets, roads or highways. Circuity of travel shall not be a compensable item of damage."

For example, in *Walker v. State*, the highway department wanted to build a concrete bar or curb at the center of a highway. *Walker v. State*, 48 Wn.2d 587, 588-89, 295 P.2d 328 (1956). The curb would prevent westbound travelers on the highway from turning left into the plaintiffs' motel, although they could travel further west, turn around, and come back to stop at the motel. *Id.* The plaintiffs asked for damages based on this diversion of westbound traffic from their motel business. The court held that they had no property right in the continuance of the flow of traffic past their property, noting the plaintiffs still had unimpeded access to and from their property:

> Re-routing and diversion of traffic are police power regulations. Circuity of route, resulting from an exercise of the police power, is an incidental result of a lawful act. It is not the taking or damaging of a property right.
> Although an abutting property owner may be inconvenienced by one-way traffic regulation immediately in front of his property, he has no remedy if such regulation be reasonably adapted to the benefit of the traveling public.

9

*Id.* at 591.

Similarly, in *Kahin v. City of Seattle*, the court held as a matter of law that although the installation of traffic markers to direct the flow of traffic in and out of the plaintiff's gasoline station could interfere with customer's convenient access to the station, this did not entitle the plaintiff to compensation. *Kahin v. City of Seattle*, 64 Wn.2d 872, 876, 395 P.2d 79 (1964). The court pointed out that there was no physical barrier to the plaintiff's access and that vehicles were not prevented from driving onto or leaving the property. *Id.* at 874. The court noted that the plaintiff and his customers were "'in the same position and subject to the same police power regulations as every other member of the traveling public.'" *Id.* (quoting *Walker*, 48 Wn.2d at 590).

The Gibsons overlook this well-established precedent and misstate the effect of the roundabout on access to the apartments. They allege that they have lost "[a]ll [a]ccess from Montgomery to [their] [p]roperty" and claim that the apartments are "now completely inaccessible from Montgomery." Br. of Appellants at 15, 20. Relying in part on *Fry v. O'Leary*, 141 Wash. 465, 252 P. 111 (1927), they contend it is immaterial that the ingress-egress driveway is on Wilbur and assert that direct access from the abutting street onto the property is not necessary for compensation.

The Gibsons misstate the holding of *Fry*. In that case, a portion of the street

10

adjacent to the Frys' lot was vacated so that a garage placed in the street could be permitted. *Id.* at 466-67. This left the Frys with one-half the street width they had previously enjoyed. *Id.* at 470. The court held that vacation of one-half of a street in front of an owner's parcel is compensable because an owner's right of access extends to the full width of the street. *Id.* at 470. Here, the roundabout did not cause the vacating of one-half of the width of Wilbur nor did it cause a private improvement to be placed in the public right-of-way adjacent to the apartment's point of access to Wilbur. Wilbur itself has not been altered.

Maps of the area show that the Gibsons still have direct access to the apartment complex, even though access from Montgomery to Wilbur may be less convenient than before the roundabout was built. Moreover, directions of travel on Wilbur were not altered by the roundabout. A driver on Wilbur can travel southbound to the roundabout and, from that point, may travel in any direction. The roundabout changed a route that eastbound drivers can take to get to the apartments from East Montgomery. However, drivers eastbound on Montgomery continue to have access to the apartments by Jackson Avenue and the roundabout has no effect on drivers approaching the apartments from the east along East Mansfield. Based on traffic count data, most drivers access the apartments from the east by means of North Pines Road. In sum, travelers on

11

Montgomery lost the convenience of a left turn onto Wilbur. This is not a compensable taking under Washington law.

Nevertheless, citing *Union Elevator*, the Gibsons assert that "if the circuity of route imposed is severe enough, it is not a bar to a claim." Br. of Appellants at 27. They assert that summary judgment is improper "when there is evidence that the new route imposed by the condemnation impairs access to the extent that the property owner's business is impaired." Br. of Appellants at 24. They claim that in this case, their damages exceed those of the general public and are, therefore, compensable. They reiterate that the "question of impact beyond that experienced by the general public is necessarily a question of fact." Br. of Appellants at 25.

*Union Elevator* does not support the Gibsons' claim. In that case, the Washington State Department of Transportation closed an intersection as part of a highway upgrade project. *Union Elevator*, 96 Wn. App. at 290-91. Because of the redesign, farmers were only able to access Union Elevator's grain elevator by negotiating a long and tortuous county road. *Id.* at 291-92. The evidence showed that truck drivers were required to negotiate a steep downhill grade, approach a 90 degree turn to the left, a 90 degree turn to the right, and then a drive up a severely sloped driveway to reach the grain storage facility. *Id.* at 291, 296-97. As a result, long-time customers stopped using the facility

12

because of the distance and dangerousness of the route. The property owners filed suit, complaining that the highway redesign completely destroyed all economically viable use of their facility. Emphasizing that this was a "fact-driven" case, this court held that summary judgment dismissal was improper because Union Elevator was able to show "damages different from that of the general public." *Id.* at 295, 297.

In contrast, the Gibsons can only show "inconvenience at having to travel a further distance to [their] business facility." *Union Elevator*, 96 Wn. App. at 296. Access to the apartments does not require negotiating steep grades and blind turns. Moreover, Union Elevator was the only business affected by the road closure. Here, in contrast, other apartment owners were affected. Mr. Gibson himself testified that the change in access would have a similar effect on an apartment complex northeast of his building and Ms. Note testified that she received a complaint from an apartment owner regarding the roundabout.

To reiterate: deprivation of the most "direct and convenient" access to property is insufficient to maintain an inverse condemnation claim. *Walker*, 48 Wn.2d at 590-91. Where a landowner retains an alternative mode of ingress or egress to the property in question, the owner's damages are "not different in kind even though different in degree from that suffered by others [and therefore] has no legal basis for complaint." *Hoskins*, 7

13

Wn. App. at 960.

Here, the Gibsons lost the convenience of making a left turn onto Wilbur from Montgomery. This regulation of traffic does not constitute a compensable taking or damaging of property under Washington law. The trial court properly granted summary judgment on this issue.

*Estoppel Claim.* Next, the Gibsons maintain that they produced enough evidence to support a promissory estoppel claim regarding the City's alleged promise to pay for a new access point on Montgomery. On appeal, they assert that under equitable principles "the trial court should have evaluated the elements of a claim for promissory estoppel to determine if [the Gibsons] propounded sufficient evidence to survive summary judgment." Br. of Appellants at 31. We agree.

Montgomery's original complaint separately identified four causes of action: inverse condemnation, misrepresentation, estoppel, and "[d]amages [a]rising [o]ut of [c]onstruction of the Round-About." CP at 7-8. As originally pleaded the third, "estoppel," cause of action incorporated the preceding allegations of the complaint, and alleged, at paragraph 28:

14

28. For reasons including but not limited to those stated herein, Spokane Valley is estopped from . . .[2] denying compensation to MCA [Montgomery Court Apartments] for the costs of constructing a new access on Montgomery. MCA acted in reliance on Spokane Valley's statements and acts by agreeing to the easement and right of way and expending time and expense in obtaining estimates for the second access. MCA has been injured, and will continue to be injured, if Spokane is allowed to repudiate its prior statements and acts in an amount to be proven at trial.

CP at 8. The relief prayed for in the original complaint was money damages, costs and fees, and any other relief that the court deemed equitable and proper.

Although never explicitly at issue in later summary judgment proceedings, Montgomery's promissory estoppel claim was supported by evidence later presented to the court. When deposed, Mr. Gibson recounted statements made at a meeting with representatives of the City and county that he attended on or about July 18, 2008. As he described that meeting, the government representatives sought to deter him from legally challenging the then-existing design for the roundabout, which would increase the City's cost and delay construction. To induce him to forgo the threatened challenge, the government representatives offered to design and construct a new access into the

---

[2] The ellipses omit "refusing to modify the round-about," run-on language that can only be read as a drafting error. It is not clear whether Montgomery intended to allege that the City was estopped from refusing to modify the roundabout as well as from denying compensation. The run-on language makes paragraph 28 somewhat ambiguous. The request for monetary relief, given the concluding language "in an amount to be proven at trial," provides some clarification.

apartments from Montgomery, something they claimed to have funds available to do. Mr. Gibson testified that the alternative of the City constructing a new access to the apartments from Montgomery was a "'very, very distant second choice'" from his perspective but one to which he ultimately agreed. CP at 491.

Montgomery produced electronic mail that Mr. Gibson sent to a county employee who participated in the July 18 discussions on the Monday following that meeting. The communication outlined, in bullet points, "the settlement offer I understand as suggested by the County and City," noting that "[i]f I've properly covered the terms we'll need to formalize this as an agreement." CP at 507. The bullet items identified the approximate location of the new access, the costs associated with its design and construction that would be covered by "[t]he county / city," and provided that the "County / City will negotiate on behalf of the property owner with utility companies and governmental agencies to insure acceptance and co-operation with the changes above." CP at 507-08.

A county representative responded to the electronic mail a couple of days later, stating:

> Jon,
> I have corresponded with the City and they agree with this arraignment [sic]. We will proceed with the layout of the approach and of course share that with you before we finalize. Please send me the cost estimates as soon

16

as they are available. I will put the package together and formalize the
agreement for the parties to sign.
Thanks

CP at 507. Several months later, Mr. Gibson forwarded cost estimates of $168,000. It was at that point that electronic mail communications between City and county representatives reveal that City engineers claimed a different recollection of what was discussed and agreed to at the meeting in July.

In a first amended complaint filed approximately eight months after the action was commenced, Montgomery recharacterized its third cause of action more broadly as one for "Equitable Relief." CP at 27. Paragraph 28, alleging estoppel, remained unchanged. A new paragraph 29 was added to the "Equitable Relief" cause of action, requesting injunctive relief. It stated:

> 29.    For reasons including but not limited to those previously stated herein, MCA is entitled to injunctive relief. The Court has jurisdiction over The City of Spokane Valley and authority to impose an injunction preventing Spokane Valley from operating and/or managing traffic flow in such a manner that vehicle eastbound on Montgomery is unable to use the roundabout to make a left-hand turn and travel northbound on North Wilbur Road, where the entrance to the apartment complex is located.

CP at 27-28. The amended complaint's prayer for relief now explicitly requested injunctive relief in addition to the earlier request for money damages, costs and fees.

17

Following Montgomery's amendment of its complaint, the City moved for partial summary judgment dismissing Gibsons' first three causes of action. When it came to Montgomery's third cause of action, however, the City's motion papers addressed only the right to injunctive relief asserted in paragraph 29. Neither the motion nor supporting memorandum said anything about the "estoppel" paragraph, paragraph 28.

For instance, the City's "introduction" to its arguments for summary judgment said only the following about Montgomery's third cause of action:

> As a third claim, plaintiffs seek an injunction to "prevent[] Spokane Valley from operating and/or managing traffic flow" as currently regulated by the roundabout. ([First Amended Complaint] at ¶ 29). But the City's decision to build the roundabout was part of an area-wide transportation improvement project. Plaintiffs have no evidence that the City's decisions regarding transportation planning were beyond its authority, or that the decisions were reached in an unlawful or arbitrary and capricious manner.

CP at 326-27.

The section of its legal memorandum requesting dismissal of Montgomery's third cause of action was entitled "Plaintiffs' *request for injunctive relief* should be denied." CP at 345 (emphasis added). Legal argument relating to that third cause of action comprised only two pages of the City's 31-page legal memorandum and dealt solely with the remedy of injunction.

18

Montgomery responded to the City's motion for partial summary judgment with a cross motion for partial summary judgment. Its cross motion sought judgment as a matter of law only on its inverse condemnation claim. Although it did not move for summary judgment on its third cause of action, Montgomery's discussion of background facts referred to the City's alleged promise and its reliance, with citations to supporting evidence:

> In July 2008, Mr. Gibson met with City representatives in attempts to resolve the access issue as the City did not want their construction schedule impacted. . . . To avoid any potential delay, the City made promises to Mr. Gibson that, in return for his not delaying the construction of the roundabout, the City would:
>
> (1)    Pay the costs of constructing a new access point to the property on Montgomery, subsequent to Mr. Gibson obtaining estimates for such a construction;
>
> (2)    Find a satisfactory resolution to the access issue in good faith and assured Mr. Gibson that money was not an issue; and
>
> (3)    Draft a written agreement memorializing its commitment to arranging and paying for a solution to the limited access problem, while Mr. Gibson obtained estimates.
>
> . . . .
>
> Relying on the City's representations, Mr. Gibson expended substantial time and money to get the estimates and halted his efforts to stop construction, but the City never produced the written agreement it specifically promised. Mr. Gibson relied on the City's representations and spent approximately $4,000 obtaining costs estimates. When it received the estimates, the City breached its commitments to Mr. Gibson and offered to pay him only $1,500, an amount that failed to compensate Mr. Gibson for even the cost of obtaining estimates.

CP at 601. Among the deposition testimony and documentary evidence supporting these

19

allegations was the evidence described above.

The City's 18-page reply brief in support of its motion for summary judgment devoted only one-half of a page to Montgomery's third cause of action. It again characterized that cause of action as seeking only "an injunction to compel the City to modify the roundabout." CP at 679. Its introduction to its reply argument makes clear that Montgomery's allegations in support of promissory estoppel were simply not on the City's radar screen:

> The most important part of this case is the plaintiffs' claim for inverse condemnation. This is the root out of which plaintiffs' misrepresentation claim grows. If the inverse condemnation claim fails, then plaintiffs were indeed paid just compensation for the property rights that were actually acquired, and the Court need not reach the misrepresentation issues at all.

CP at 665.

Finally, and unsurprisingly, in the hour that the trial court set aside for argument of the cross motions for summary judgment, the words "promissory estoppel" and "estop" were not used at all. Neither party nor the court made any reference to the alleged promises that had been made to Mr. Gibson on July 18 as asserted by paragraph 28 of the first amended complaint.

The trial court took the cross motions for summary judgment under advisement and announced its decision in a letter opinion. Its entire discussion of the third cause of

20

action states:

> Absent a cause of action for inverse condemnation, plaintiffs' claim for equitable relief fails as well.

CP at 796.

The only claim that the trial court recognized as surviving summary judgment was Mr. Gibson's misrepresentation claim. Its order on the motions for summary judgment concluded that the City was entitled to summary judgment as a matter of law on plaintiffs' causes of action based on inverse condemnation and equitable relief. It thereby dismissed Montgomery's promissory estoppel theory, although there is literally nothing in the record to suggest that it did so advertently.

In order to state a claim for promissory estoppel, a plaintiff must present evidence of: (1) A promise which (2) the promisor should reasonably expect to cause the promisee to change his position and (3) which does cause the promisee to change his position (4) justifiably relying upon the promise, in such a manner that (5) injustice can be avoided only by enforcement of the promise. *Corbit v. J.I. Case Co.*, 70 Wn.2d 522, 539, 424 P.2d 290 (1967).

In moving for summary judgment, the City never touched in any substantive way on the promissory estoppel component of Montgomery's third cause of action. It thereby necessarily failed to sustain its burden of offering factual evidence showing that it was

21

entitled to judgment as a matter of law on that claim. Under *Graves v. P.J. Taggares Co.*,[3] summary judgment dismissing the promissory estoppel component should have been denied on that basis alone.

Beyond that, however, Montgomery's evidence in opposition to the City's motion for summary judgment did (though not necessarily advertently) raise a genuine issue of fact as to each element of promissory estoppel. It demonstrated genuine issues of fact as to the City's promises; a context inviting reliance, resulting reliance, and resulting harm.

Because the City never made a threshold showing that it was entitled to judgment as a matter of law on Montgomery's promissory estoppel claim and Montgomery presented evidence that supported it, we reverse the dismissal of that claim and remand it for trial.

*Attorney Fees.* The Gibsons assert that they are entitled to attorney fees under RCW 8.25.075(3) if they prevail on appeal. Because they are not the prevailing party on appeal, they are not entitled to attorney fees.

We affirm the trial court's summary judgment in favor of the City on all claims except the promissory estoppel claim. We reverse dismissal of that claim and remand for trial.

---

[3] *Graves v. P.J. Taggares Co.*, 94 Wn.2d 298, 302, 616 P.2d 1223 (1980) (quoting

No. 30802-2-III
*Gibson v. City of Spokane Valley*

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Kulik, J.

WE CONCUR:

_____        _____
Siddoway, A.C.J.                                              Brown, J.

*Jacobsen v. State*, 89 Wn.2d 104, 108, 569 P.2d 1152 (1977)).